UNITED STATES of America, Appellee,

v.

**Edward PASTOR and Martin Weiner, Defendants-Appellants.**

**Nos. 577, 578, Dockets 76–1364, 76–1423.**

United States Court of Appeals, Second Circuit.

Argued Feb. 22, 1977.

Decided May 19, 1977.

See also D.C., 419 F.Supp. 1318.

Richard H. Kuh, New York City (Andrew R. Cooper, Bennett L. Gershman, Kuh, Sha- piro, Goldman, Cooperman & Levitt, P. C., New York City, of counsel), for appellant Pastor.

Joel A. Brenner, New York City (Gerald L. Shargel, Fischetti & Shargel, New York City, of counsel), for appellant Weiner.

John J. Kenney, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., Henry H. Korn, Robert J. Costello, Robert B. Mazur, T. Barry King- ham, Frederick T. Davis, Asst. U. S. Attys., New York City, of counsel), for appellee.

Before MANSFIELD, VAN GRAAFEI- LAND, Circuit Judges, and CARTER, Dis- trict Judge.*

MANSFIELD, Circuit Judge:

Appellants Edward Pastor and Martin Weiner were convicted of obtaining and conspiring to obtain controlled substances through false representation and forgery in violation of 21 U.S.C. §§ 843, 846 of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (the "Act"), after a trial before a jury and Judge Constance Baker Motley of the Southern District of New York. Pastor was sentenced to con- current terms of six months and four years. Execution of the four-year term was sus- pended, he was placed on probation for five years, and he was fined $5,000. Weiner was sentenced to a six-month term, imposi- tion of which was suspended, placed on probation for two years, and fined $3,000. We affirm.

Only a brief summary of the underlying offenses is necessary to resolve the issues raised on appeal. Prior to June, 1973, Pas- tor and Weiner, pharmacists in the Phila- delphia area, had been dealing in large quantities of anoretic drugs known as phen- dimetrazine and phentermine. These drugs are often prescribed for use in weight re- duction programs, but are also in demand for illicit purposes because they have quali- ties similar to amphetamines ("speed"). Formerly these drugs could be obtained by

---

* Of the United States District Court for the Southern District of New York, sitting by des- ignation.

pharmacists without complying with the regulations of the Act, 21 U.S.C. §§ 821, *et seq.* However, on June 15 and July 6, 1973, respectively, these drugs were placed on the schedules of controlled substances by order of the Attorney General pursuant to § 811 of the Act. Phendimetrazine was placed in Schedule III and Phentermine in Schedule IV, 21 U.S.C. § 812.

Thereafter, Pastor and Weiner continued to purchase these drugs from Charles Fernald and Douglas Berry, partners in Wingate Sales Corporation, a New York City drug distribution company. Each transaction was recorded by Fernald and Berry on invoices bearing the name of one Dr. Horace Johnson, a Philadelphia physician who had no knowledge of the transactions. In October, 1973, Pastor ordered from Fernald 250,000 capsules of phendimetrazine which Fernald obtained from Vitarine Corp., a Long Island drug manufacturer. The next month, however, Fernald informed Pastor and Weiner that Vitarine would no longer supply through him such large quantities of the drugs without a written request from a physician. Pastor then sent to Fernald a letter purporting to be from Dr. Johnson, which contained Dr. Johnson's drug registration number and a request to ship the capsules. In fact, the stationery and the signature had been falsified by Pastor. Fernald relayed the letter from New York to Vitarine in Long Island, and six shipments totalling 1,200,000 capsules were sent by the company to a Philadelphia terminal. There, Pastor, posing as Dr. Johnson, received the shipments and Pastor and Weiner paid Fernald in cash for each shipment.

On April 18, 1974, Pastor sent Fernald a second forged letter ordering an additional 1,000,000 phentermine capsules which were sent by Vitarine to Pastor who then paid Fernald.

The jury convicted appellants of two counts, one charging violation of 21 U.S.C. § 843, which prohibits the acquisition of a controlled substance by "misrepresentation, fraud, forgery, deception, or subterfuge," and the other charging conspiracy.

## DISCUSSION

### *Pastor's Sixth Amendment Claim*

■ The first issue is whether Judge Motley violated Pastor's Sixth Amendment right to be present at his trial when she empaneled the jury in his absence on the first morning of the trial after Pastor failed to appear and advised the court that he was ill. Resolution of this issue depends upon whether the district court's finding that Pastor had voluntarily and without justification absented himself from the trial was clearly erroneous, and whether the court's decision to commence the proceedings was an abuse of discretion.

■ It is settled beyond dispute that an accused has a constitutional right to be present at all stages of his trial, *Taylor v. United States,* 414 U.S. 17, 94 S.Ct. 194, 38 L.Ed.2d 174 (1973), F.R.Cr.P. 43(a), including the empaneling of the jury, *United States v. Toliver,* 541 F.2d 958 (2d Cir. 1976); *United States v. Crutcher,* 405 F.2d 239 (2d Cir. 1968), cert. denied, 394 U.S. 908, 89 S.Ct. 1018, 22 L.Ed.2d 219 (1969). However, it is equally well settled that the defendant may waive this right by voluntarily and deliberately absenting himself from the trial without good cause, *United States v. Tortora,* 464 F.2d 1202 (2d Cir.), cert. denied, 409 U.S. 1063, 93 S.Ct. 554, 34 L.Ed.2d 516 (1972); *United States v. Taylor,* 478 F.2d 689 (1st Cir.), aff'd, 414 U.S. 17, 94 S.Ct. 194, 38 L.Ed.2d 174 (1973); *United States v. Miller,* 463 F.2d 600 (1st Cir.), cert. denied, 409 U.S. 956, 93 S.Ct. 300, 34 L.Ed.2d 225 (1972); *United States v. Marotta,* 518 F.2d 681, 684 (9th Cir. 1975); *Government of Virgin Islands v. Brown,* 507 F.2d 186, 188-90 (3d Cir. 1975); see *Illinois v. Allen,* 397 U.S. 337, 343, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), either before or during trial, *United States v. Peterson,* 524 F.2d 167, 183-86 (4th Cir. 1975), cert. denied, 423 U.S. 1088, 96 S.Ct. 881, 47 L.Ed.2d 99 (1976). "A defendant who deliberately fails to appear in court does so voluntarily, and thus the important question is whether his absence can be considered a 'knowing' waiver. We hold that it can. The delib-

erate absence of a defendant who knows that he stands accused in a criminal case and that the trial will begin on a day certain indicates nothing less than an intention to obstruct the orderly processes of justice. No defendant has a unilateral right to set the time or circumstances under which he will be tried." *United States v. Tortora, supra,* 464 F.2d at 1208. Where the court finds that the defendant has voluntarily absented himself from the proceedings, it may decide to proceed in his absence only after balancing a "complex of issues" including the additional burdens, waste and expense inflicted upon the court, government, witnesses, and co-defendants, and the public's interest in seeing the accused brought to trial as well as the court's responsibility to do so speedily. *United States v. Tortora, supra; United States v. Peterson, supra.* While the Sixth Amendment demands that courts give the utmost solicitude to the defendant's right to be present at each stage of trial, it does not require the trial judge to accept at face value a defendant's claim of inability to appear in court, particularly where other defendants are involved, *United States v. Tortora, supra,* 464 F.2d at 1210, and where the government has spent considerable time, energy and money in preparing for trial and assembling witnesses and a panel of veniremen in the expectation that trial will proceed as scheduled. Cf. *United States v. Wilson,* 421 U.S. 309, 318, 95 S.Ct. 1802, 44 L.Ed.2d 186 (1975).

The decision as to whether the defendant's voluntary absence from the trial amounts to a waiver is thus vested in the sound discretion of the trial judge, who is usually in a superior position to evaluate the evidence, including witnesses' credibility, because of familiarity with the background and circumstances. Moreover, where an evidentiary hearing is conducted to examine these circumstances, the trial judge's findings which form the basis of his or her decision on the issue will not be disturbed unless found to be clearly erroneous. See *United States v. Lucchetti,* 533 F.2d 28, 36 (2d Cir. 1976); *United States ex rel. Delle Rose v. LaVallee,* 468 F.2d 1288, 1290 (2d Cir. 1972), *cert. den.,* 414 U.S. 1014, 94 S.Ct. 380, 38 L.Ed.2d 251 (1973); 3 Wright, Fed.Practice and Procedure, § 675, p. 130 (1969).

In the present case the question of whether Judge Motley abused her discretion in concluding that Pastor's absence amounted to a waiver entitling her to proceed with the trial, or based this conclusion on any clearly erroneous material findings, requires us to review the background. In 1966 Pastor suffered a heart attack and in 1968, 1972 and 1974 he was hospitalized for varying periods suffering from angina pectoris, which refers to chest pains often due to coronary disease. However, since his 1966 attack Pastor has never suffered another heart attack. Following the indictment of Pastor and Weiner on July 31, 1975, Pastor was arraigned on August 18, 1975. On September 10, complaining of chest pains, he went into the hospital where he remained until September 22, when his counsel appeared before Judge Motley for a pretrial conference and furnished the court with a letter from Pastor's personal physician describing his heart condition and advising that surgery within the next three to four months was being contemplated. However, no such surgery was ever performed. After further postponements of pretrial motions at Pastor's request and over government objection, the case was scheduled for trial on January 15, 1976. However, trial was further postponed to February 13, 1976, when Pastor's counsel filed additional motions, including one for a medical examination to determine Pastor's fitness to stand trial.[1]

On February 10, 1976, Pastor was examined by Dr. Leslie A. Kuhn, his doctor, and on February 11, 1976, by Dr. Meyer Texon, a physician selected by the government. When Judge Motley scheduled a hearing for

---

1. A motion seeking further delay because of the filing of a superseding indictment was denied on the ground that the new indictment was essentially the same as the old and did not contain any significant changes.

February 17 to examine into Pastor's fitness to stand trial and directed that he be present for examination, particularly regarding his ability voluntarily to testify before the Federal Trade Commission for several hours on January 14, 1976, in spite of his claims of inability to stand trial, Pastor entered a philadelphia hospital the day before his scheduled appearance. On February 17 Judge Motley went ahead with a full day's hearing at which the two doctors (Kuhn and Texon) testified at length with respect to the nature and extent of Pastor's heart condition and the reasons for his absence from court that day. The proof disclosed that the government's physician, relying primarily on Pastor's description of his own subjective symptoms (mostly pain), diagnosed his condition as "mild" congestive heart failure (which is not a heart attack but insufficient pumping of blood) and prescribed 7 to 10 days rest. Pastor's physician represented that several months confinement would be required.

On February 23, 1976, over the government's objection, Judge Motley granted the application for postponement of the trial and adjourned it to May 17, 1976. On March 1, 1976, Pastor was discharged from the hospital, despite the representations by his physician.[2] When, in March, Pastor's attorney became ill with a back ailment, Judge Motley advised that the trial would not be adjourned beyond May 17 and suggested, against the possibility that his attorney would be unable to participate, that Pastor obtain additional counsel (his own lawyer headed a firm in which there were several other lawyers) and that the court would pay the additional expense if Pastor could not afford it.

As the May 17, 1976, trial date approached, efforts were once again made by Pastor, who had not required any hospitalization since the earlier threat of trial, to postpone the trial. First, a three months postponement was sought on the ground that his attorney was convalescing from the

back ailment. This was denied by the district court and we denied a writ of mandamus to compel a further adjournment. On May 9, 1976, Pastor was re-examined by Dr. Texon, the government physician, who reported that

"This patient now presents no evidence of congestive heart failure. His lungs are clear. He is able to ambulate at will in his own home and there is no evidence. that infarction or tachy-arrhythmia has appeared at any time since he has been observed during the past ten years. The anginal pains are relatively stable and appear controlled with Nitrol ointment or Nitroglycerin. . . . I believe his cardiac reserve may be considered diminished but is presently adequate to allow him to be up and about, to travel by automobile, and to participate in a court proceeding. . . . Although this patient may experience chest pain in a court proceeding, I believe it is very unlikely and only remotely possible that a myocardial infarction will occur as a result of his antecedent atherosclerosis at precisely the time of his participating in a court proceeding. Further clinical manifestations of the patient's heart disease such as tachycardia or pulmonary congestion are possible—but these, in my opinion, can be successfully controlled as in the past and constitute no serious risk or hazard to the patient's health or life in view of the relatively good cardiac status of the patient at this time."

On May 14, 1976, Judge Motley found, based on reports by both physicians (Texon and Kuhn) and the evidence taken at the hearing of February 17, "that Mr. Pastor is able to withstand the stress of participation in a criminal trial, and to assist in his own defense, without grave risk to his life or health." Recognizing that both doctors had predicted an increase in pain to Pastor from the stress of trial, Judge Motley ordered that trial proceed for only four hours per day, including recesses, and provided for the presence of Pastor's physician and a

---

**2.** Most suspicious is the hospital record for this period submitted to Judge Motley, which shows that Pastor's symptoms improved dramatically on the very day that the court adjourned trial and continued to do so until he was discharged on March 1.

registered nurse, and for periodic examinations during the course of the trial. In addition Judge Motley specified that there would be "such recesses as are required to enable Mr. Pastor to rest outside the courtroom and to receive medication," that he would be examined every two days by Dr. Texon to assure "that his health is not being seriously affected by his presence at the trial," and that Pastor's doctor could be present to conduct his own examination.

On Monday, May 17, Pastor appeared at court for hearings on pretrial suppression motions. Because of the four-hour per day limitation, the hearings were suspended and court was adjourned at 1:00 P.M., with directions to return at 9:00 A.M. on the following morning for the selection of a jury from the large panel of veniremen who had been kept waiting on Monday. However, on the following morning, May 18, neither Pastor nor his attorney appeared. Instead, his attorney's associate counsel informed Judge Motley that the defendant was suffering from a heart problem and that his wife had given him oxygen but could not get him clothed. However, the lawyer failed to present to or obtain for the court a doctor's statement, either written or oral, nor did he state whether Pastor had been examined by a physician or admitted to a hospital. Instead, he advised that Pastor's counsel had been unsuccessful in inducing Dr. Texon, the government's physician, to examine Pastor and that he did not know whether Dr. Kuhn would "be able to see Mr. Pastor or not."

The facts, as developed at a post-trial hearing and found by Judge Motley, were that despite Pastor's assertion that he had first suffered severe pain and sweating at 7:00 A.M. on the morning of May 18, 1976, no effort was made to call his physician, Dr. Kuhn. Pastor's wife testified that she telephoned his attorney at 8:00 A.M. The attorney, instead of calling Pastor's physician (Kuhn), who was at home and available, telephoned the government physician (Texon), who understandably refused to treat or examine Pastor without a court order. No effort was made to communicate with Dr.

Kuhn until shortly before 9:00 A.M. when he arranged for Pastor to go to the Mount Sinai Hospital for examination at 10:00 A.M. Thus Pastor was not examined until three hours after his "attack" had occurred, even though his own doctor had been available for consultation and examination.

In the meantime, in the absence of medically-confirmed incapacity, Judge Motley, having experienced earlier efforts by Pastor to adjourn trial despite expert medical opinion to the effect that he was able without any serious risk to his health to stand trial, revoked Pastor's bail and ordered that he be brought to court by the United States Marshal. She then proceeded with selection of the jury from the panel of veniremen in order to allow the others to return home. All other proceedings in the case were suspended until the next day. In a later-written opinion Judge Motley stated that Pastor's "failure to have a doctor's affidavit, or even an unsworn doctor's statement, in court by 9:00 A.M. constituted (in view of the arrangements made in this case to have defendant's doctor examine him during trial) a voluntary absence by the defendant. It was too plain for argument that the public interest required that the court proceed."

At 11:30 A.M. on May 18, after trial had proceeded against both Pastor and his co-defendant Weiner, with counsel for each participating, and after the jury had been selected, the court received an affidavit from Dr. Kuhn indicating that Pastor had experienced a painful attack and suspected the possible existence of acute myocardial infarction, a deterioration in Pastor's condition. At 6:00 P.M. the government physician examined Pastor and found no acute myocardial infarction, but simply "another episode of angina pectoris—possibly more severe clinically than usually—but still reversible," and recommended that Pastor return to the court on May 20th. As Pastor's presence at trial over the next two weeks demonstrated, this diagnosis proved correct.

After hearing testimony on the defendant's condition on May 19, Judge Motley refused to reinstate defendant's bail, and

found that in view of the precautions taken for the trial, Pastor was able to be present and participate. Thereafter, Pastor experienced no physical difficulties preventing his attendance and appeared at trial each day. During the trial, Pastor was reprimanded by the court for displaying to the jury several bottles of pills, his hospital wristband, and the heart monitoring devices attached to his chest visible through a see-through shirt.

After completion of the 12-day trial Judge Motley resumed the evidentiary hearing with respect to Pastor's condition on May 18, 1976, to determine whether he had been able to attend trial on that date, taking testimony of various witnesses, including Mr. and Mrs. Pastor. On November 16, 1976, Judge Motley filed her findings of fact and opinion denying Pastor's motion for a new trial, which had been based on his absence during the empaneling of the jury.[3] Judge Motley found that, assuming Pastor had experienced pain on the morning of May 18 and that his symptoms, which had been almost entirely subjective, were accepted at face value, he "did not suffer a physiological impairment so severe and so serious as to excuse his absence from the court on that morning"; and that he had "intentionally manipulated what was—at worst—a marginally more painful episode of his chronic angina pectoris as an excuse to frustrate and delay the commencement of his trial on the criminal charges in this case." Instead of immediately seeking help from his own doctor or going to the hospital, which might have led to his having to go to court, he had deliberately delayed doing so, even though he knew that a physician's statement would be required to obtain an adjournment. His gesture in calling the government doctor was found to be a "transparent ploy" designed to avoid standing trial. Furthermore, the court found that while some of the cardiographs were consistent with his claims of pain, they were by no means conclusive and in any event did not indicate he was suffering a heart attack or anything more serious than the malady which he had experienced all along. Judge Motley concluded that, given the totality of the circumstances, he had voluntarily and without justification absented himself from the trial.

Based on our examination of the record, we are satisfied that these findings, being supported by evidence of record, are not clearly erroneous. We further conclude that Judge Motley did not abuse her discretion in proceeding with the selection of a jury in Pastor's absence. Although this defendant had repeatedly been found physically able, despite his illness, to stand trial, he had previously attempted, by exaggerating his illness and resorting to hospitalization, to postpone the proceedings in this case, as we evidenced by his voluntary hospitalization in September, the suspiciously-short February hospitalization, and his various other motions for adjournment. His principal symptom (pain) was subjective[4]

3. Since Judge Motley denied Pastor's motion for a new trial on September 17, 1976, prior to the taking of this appeal, and advised the parties at that time that she would draft an opinion setting forth her findings of fact and reasoning, there is no bar to our consideration of her decision, *Reinstine v. Rosenfield,* 111 F.2d 892 (7th Cir. 1940). Compare *United States v. Ellenbogen,* 390 F.2d 537, 542 (2d Cir.), *cert. denied,* 393 U.S. 918, 89 S.Ct. 241, 21 L.Ed.2d 206 (1968). Indeed, we have serious doubts about the position our colleague takes in dissent, because it would encourage litigants to appeal an oral order when it would be to their advantage to present this court with an incomplete record, even though the trial judge (as here) has specified that a written opinion would follow.

The better practice would be for the district judge to refuse to issue a final order until a contemporaneous set of findings have been prepared, and for litigants fearing that such an oral order might trigger the time limitations on the perfection of an appeal to urge the court to state for the record that its order will not be "final" until the filing of the written decision.

4. While it is undisputed that Pastor suffered from arteriosclerosis, hardening of the arteries, both the government physician and Pastor's own physician characterized his attack on May 18 as angina pectoris, which is chest pain resulting from inadequate blood flow to the heart due to reduced artery capacity. Necessarily, the key symptom of such an attack is the patient's subjective statement that he is feeling pain.

and his other symptoms could have been self-induced.[5] He apparently had been quite able, when it served his purpose, to testify at length before the Federal Trade Commission in January, 1976. The timing of his claim of illness on the morning trial was to proceed, coupled with his failure to get in touch with his doctor, who was available, when considered against the foregoing background, was extremely suspicious. Moreover, Judge Motley who viewed the defendant, his wife and the doctors as witnesses, found the defendant to be an incredible manipulator. In short, having a full and detailed grasp of the situation, she was satisfied that Pastor was attempting to deceive the court in a vain effort to escape trial. It is significant that, when this bluff was called, Pastor was physically able to attend the 12-day trial without any interruption attributable to his illness.

Against Pastor's interest in postponing his trial, there were other weighty interests favoring the continuance of trial. More than 50 veniremen had been called and kept waiting on Monday, May 17, at considerable trouble and expense. Because of the small size of the courtroom in which the case was to be tried, which could not accommodate 50 potential jurors, another courtroom had to be borrowed by special arrangement for the selection of the jury. Pastor's co-defendant, Weiner, was entitled to proceed with trial rather than face the indefinite adjournment that would probably have otherwise occurred since, if the court had not ordered trial to proceed, Pastor would have remained hospitalized or resorted again to hospitalization. In the event of a severance the government would have been obligated to try the case, which took 12 days for trial, twice. In addition, the government had assembled its witnesses, including one elderly and enfeebled material witness, Dr. Horace Johnson. Lastly, Judge Motley had arranged her schedule and time for the trial and could hardly be expected to find another case ready for immediate trial.

With due respect, Judge Van Graafeiland's forceful dissent would have us, in considering the propriety of the district court's action in this case, confine ourselves to the events of the morning of May 18, 1976, and even then to consideration only of the evidence tending to support appellant's contentions. Were we to so limit ourselves, the justification for affirmance would, of course, not be so compelling. But we refuse to take such a view, which is limited to but a fragment of the entire record.

■ The events of May 18 must be appraised in the revealing light of what went on before and after that date. The record discloses persuasive evidence of studied prior efforts on the part of Pastor repeatedly to gain postponements or other advantages by hospitalizing himself on the basis of subjective complaints that appear to be suspiciously lacking in substance. This occurred, for instance, just prior to his counsel's September 22, 1975, pretrial conference, which was called for the usual purposes, including the fixing of a trial date, and again immediately before Pastor's scheduled appearance on February 17, 1976, to determine his ability to stand trial. On each occasion, as soon as the hospitalization had served its purpose, Pastor emerged from the hospital to go about his daily business. Moreover, he voluntarily testified before the FTC in January 1976, when it was in his interest to do so.

The "uncontroverted and undisputed testimony," moreover, discloses that, despite the use by the hospital and doctors of medical terminology that may sound impressive to laymen (and apparently to our colleague), there was no appreciable change in Pastor's basic condition on the morning of May 18. It was essentially the same as it had been for months, if not for years. Furthermore, it was consistent with pain or absence of pain. The existence of "angina" or "angina episodes," which had occurred in the past and might be expected to recur in

---

**5.** Physical activity, which taxes the reduced capacity of the arteries, is known to cause angina pectoris, and Pastor's "mild" congestive heart failure of February 17, characterized by coughing and the presence of fluid in the lungs, can be self-induced in a patient suffering from arteriosclerosis by ingestion of large amounts of liquids.

the future, depended on Pastor's word. In fact, there was no further injury to or alteration in the condition of his heart. Absent a doctor's statement of some sort, oral or written, indicating that Pastor's "attack" on the morning of May 18 was more than one more effort to delay his trial, Judge Motley acted reasonably in denying the application for a postponement. Moreover her decision to proceed was confirmed by the fact that Pastor proved to be fully capable of attending and participating thereafter in the trial which lasted from May 17 to June 4, 1976.

Thus, even viewed with the benefit of hindsight, Judge Motley's conduct was not erroneous and does not call for the characterizations used by our dissenting colleague. Although our distinguished colleague reacts differently to the events of the morning of May 18 and takes the view that the better course would have been to delay trial for a few hours or a day to obtain further medical reports, this assumes that Pastor would not then have resorted to even further claims of pain and stayed in the hospital indefinitely rather than have promptly returned to the courtroom and attended trial upon learning that Judge Motley was not to be deceived. If Pastor's past efforts are any indication, he would almost certainly have remained in the hospital if his tactics had been successful in securing any postponement. Accordingly, we refuse to find that the trial judge, who was intimately acquainted with the circumstances, erred in concluding that Pastor's absence was but one more ploy in an elaborate game designed to disrupt the trial and the court's control of it.

### Appellant's Claims of an Unconstitutional Delegation

We turn next to appellants' claim that 21 U.S.C. § 811, which empowers the Attorney General to add to or reschedule substances subject to the restrictions of the Act, is an unconstitutional delegation of legislative power. Since phentermine and phendimetrazine became controlled by order of the Attorney General, appellants claim that

their convictions must be reversed. We disagree, and find that the delegation to the Attorney General is necessary and properly designed to give effect to a clear statement of Congressional policy.

Under § 811 of the Act, the Attorney General may add a substance to the control schedules in the Act "if he (A) finds that such drug or other substance has a potential for abuse, and (B) makes with respect to such drug or other substance the findings prescribed by subsection (b) of section 812 of this title for the schedule in which the drug is to be placed." Section 811(b) provides that before initiating this procedure, the Attorney General "shall" request from the Secretary of Health, Education and Welfare a report on the drug and a recommendation of scheduling. It then states that, "The recommendations of the Secretary to the Attorney General shall be binding on the Attorney General as to such scientific and medical matters, and if the Secretary recommends that a drug . . . not be controlled, the Attorney General shall not control the drug . . . .."

Section 811(c) of the Act adds eight additional criteria which the Attorney General "shall consider" with respect to the decision to control a drug, and § 812 lists factors to be taken into account in determining the appropriate schedule in which to place the drug on the basis of the potential for abuse, the extent of legitimate uses of the drug, and the type of physical and psychological dependence resulting from abuse of the drug.

Despite this particularized Congressional mandate, appellants claim that the delegation is unconstitutional, that the standards prescribed under the Act for the scheduling of substances are vague, and that the agencies failed to adhere to the prescribed standards. Neither appellant makes the claim that the drugs with which this case is concerned are not dangerous enough to be subject to regulation under the Act.

The seminal case in the area of delegation of legislative power is *Panama Refining Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935), in which the Supreme

Court overturned a conviction and fine for transportation of petroleum products in violation of an executive order issued pursuant to a statute providing that:

"The President is authorized to prohibit the transportation in interstate and foreign commerce of petroleum and the products thereof produced or withdrawn from storage in excess of the amount permitted to be produced or withdrawn from storage by any state law or valid regulation."

In analyzing the validity of the broad authority vested in the President, the Court sought to determine whether Congress had declared a clear policy in the area, whether it had set up standards to govern the President's actions, and whether Congress had required any factual finding by the President in the exercise of his authority. 293 U.S. at 415, 55 S.Ct. 241. It found all of these to be missing and the statute therefore invalid:

"The Congress did not declare in what circumstances that transportation should be forbidden, or require the President to make any determination as to any facts or circumstances. Among the numerous and diverse objectives broadly stated, the President was not required to choose. The President was not required to ascertain and proclaim the conditions prevailing in the industry which made the prohibition necessary. The Congress left the matter to the President without standard or rule, to be dealt with as he pleased." 293 U.S. at 418, 55 S.Ct. at 247.

In *Panama Refining* Chief Justice Hughes also set out circumstances in which a delegation would withstand scrutiny, recognizing that

"The Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality, which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the legislature is

to apply." 293 U.S. at 421, 55 S.Ct. at 248.

Thus, while the Supreme Court struck down the statute at hand, it laid down the important principle that "Congress may not only give such authorizations to determine specific facts but may establish primary standards, devolving upon others the duty to carry out the declared legislative policy . . . 'to fill up the details'". 293 U.S. at 426, 55 S.Ct. at 251. See also *Schechter Corp. v. United States*, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, (1935), in which the Court again struck down a statute as an improper delegation to the President, but did not depart from its analysis in *Panama Refining*.

In *American Power v. Securities and Exchange Commission*, 329 U.S. 90, 67 S.Ct. 133, 91 L.Ed. 103 (1946), the Court upheld a delegation of power to the SEC which authorized it to act to prohibit any holding company structure which might "unduly or unnecessarily complicate" the corporate structure or "unfairly or inequitably distribute voting power among security holders." In testing this broad delegation of authority the Court took into consideration the "necessities of modern legislation dealing with complex economic and social problems." It said:

"The legislative process would frequently bog down if Congress were constitutionally required to appraise beforehand the myriad situations to which it wishes a particular policy to be applied and to formulate specific rules for each situation. Necessity therefore fixes a point beyond which it is unreasonable and impracticable to compel Congress to prescribe detailed rules; it then becomes constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority. Private rights are protected by access to the courts to test the application of the policy . . . ." 329 U.S. at 105, 67 S.Ct. at 142. See also *Yakus v. United States*, 321 U.S. 414, 424–26, 64 S.Ct. 660, 88 L.Ed. 834 (1944).

In light of these decisions, it is clear that the delegation involved in this case is a proper one. The standards governing the actions of the Attorney General in selecting substances to be controlled under the Act are specifically aimed at achieving a balance between legitimate and illicit demand for a drug or other substance that may have potential for abuse, and are rooted in a strong, clearly expressed Congressional policy. The vesting of authority in the Attorney General is a recognition of the need for agency rather than Congressional response in an area where legislative action could not keep pace with the speed of technological developments, "for with new drugs being discovered and introduced at an unprecedented rate, it would be impossible for Congress to determine beforehand those drugs to which it wishes a particular policy to be applied and to formulate specific rules for each situation." *Iske v. United States,* 396 F.2d 28, 31 (10th Cir. 1968).

Although defendants claim that the "potential for abuse" standard in § 811(c) is impermissibly vague, the accompanying standards in that section and other sections, as well as the detailed legislative history relating directly to the phrase, see 1970 U.S.Code and Admin.News, 4601, adequately provide a clear and precise measure of Congress' intent and a reasonably certain guide for the Attorney General. See *White v. United States,* 395 F.2d 5 (1st Cir. 1968), *cert. denied,* 393 U.S. 928, 89 S.Ct. 260, 21 L.Ed.2d 266 (1968) (upholding against a challenge for vagueness the "potential for abuse" standard as used by Congress in delegation of power in a predecessor drug control statute).

■ We find that the delegation of authority to the Attorney General under the Act is made pursuant to a clear statement of Congressional policy, is governed by precise standards consistent with the statement of policy, and requires that specific findings be made concerning the qualities and dangers of the substances as a condition precedent to regulation. Moreover, the necessity for speedy, detailed and expert agency action in the area of drug technolo-gy cannot be disputed. The procedures prescribed by Congress for regulation of the Attorney General's decision, coupled with the availability of judicial review under § 877 of the Act, assure that the delegatee will not act capriciously or arbitrarily. The delegation is therefore constitutionally valid.

■ Appellants also contend that the delegation of authority to the Attorney General to schedule substances under the Act is inherently unfair because he is also primarily responsible for the enforcement of federal drug laws. While this claim might have some merit if the Attorney General's discretion were unfettered and the defendants could make some colorable showing of bad faith in their prosecution, this is decidedly not true in the case at bar. Under the Act, the Attorney General is prohibited from acting contrary to the recommendation of the Secretary of Health, Education and Welfare in deciding whether to schedule a drug and thereby to outlaw its use without compliance with the Act. He is also required to follow the public notice and hearing requirements of the Administrative Procedure Act, and his findings are subject to judicial review under § 877 of the Act. These checks on the actions of the Attorney General provide sufficient assurance that his dual role will. not be used unfairly. Moreover, appellants have failed to show any evidence of improper motivation on the part of the Attorney General in deciding to control these substances, and there is adequate support in the record for Judge Motley's finding that substantial evidence supported the Attorney General's decision. In addition, none of the manufacturers of these drugs, the parties most directly affected by the decision to control the substances, sought judicial review of the Attorney General's decision. Nor do appellants now contend that he was in error in scheduling the drugs. We are therefore satisfied that the Attorney General properly carried out his functions under the Act.

■ We also find that appellants' challenge to the assertion of venue in the Southern District of New York is without

merit. Under 18 U.S.C. § 3237 "Any offense involving the use of the mails . . . is a continuing offense and . . . may be inquired of and prosecuted in any district from, through or into which such . . . mail matter moves." In the case at bar, the record shows that in two instances forged letters were sent by defendants to Fernald in New York City and were received by him there and sent on to Vitarine in Long Island. Venue is therefore proper in New York City.

We find that appellants' other claims lack sufficient merit to warrant discussion. The judgments of conviction are affirmed.

VAN GRAAFEILAND, Circuit Judge (concurring in part and dissenting in part):
"He jests at scars that never felt a wound."

William Shakespeare

"Those who do not feel pain seldom think that it is felt."

Samuel Johnson

At 9:00 A.M., on May 18, 1976, when the District Judge ordered this case to trial, appellant Pastor, who had a previous history of advanced triple-vessel coronary artery disease, myocardial infarction, hypertension and severe angina pectoris, which the District Judge had earlier acknowledged to be a "concededly serious heart condition", was on his way to the Mt. Sinai Hospital.[1] The hospital history showed that he had suffered "two hours of severe anterior chest and left arm pain unrelieved by 20 nitroglycerine tablets"; that he was in severe distress on admission, was given three or four injections of morphine, was administered oxygen and was treated with nitroglycerine, and medication for premature heart beats. Electrocardiogram studies taken on admission showed that there were ST segment depressions in leads V4, V5 and V6, which had not been present previously; and, on the advice of his physician, appellant was placed in the hospital's coronary care unit for further observation and treatment.

Both the court appointed physician, Dr. Texon, and Pastor's attending physician, Dr. Kuhn, agreed that appellant was suffering from myocardial ischemia and that this was a "true anginal episode" for which he should have sought medical attention.[2] Indeed, Dr. Texon, who examined appellant on the evening of May 18, recommended that he be kept in Mt. Sinai Hospital "for at least another 24 hours. . . ." Dr. Texon advised the court on May 19 that, "if improvement continues, such as had occurred from morning to evening of yesterday, [appellant] would suffer no great risk of further infarction by being moved to a facility possibly next to the Court on the next day."[3]

---

1. The trial was originally scheduled to commence on May 17, and Pastor was present in court on that day.

2. The following are excerpts from the testimony of Dr. Texon, the court appointed physician:

   Q. And based upon what you observed you are not suggesting, are you, that Mr. Pastor should not have sought medical attention, are you?
   A. I am not suggesting that at all. Every pain has to be paid attention to.
   Q. Isn't it a fact that sound medical practice would indicate that he should indeed seek medical attention under those circumstances?
   A. That's right.

   .    .    .    .    .

   Q. After reviewing the medical records and after examining the patient, Dr. Texon [you] used the very words which I said that this attack was possibly more severe clinically than usual?
   A. That's quite possible.
   Q. And putting that aside just so we are clear, whether or not he suffered it on this morning or on previous mornings, on any occasion when these symptoms were present or this condition existed Mr. Pastor in terms of sound medical practice should medically seek medical attention. Isn't that true?
   A. That's true.

3. My brothers do not contend that I have misquoted the medical history above set forth. They say only that laymen such as I are overly impressed by medical terminology, the implication, of course, being that laymen such as they are not. For the benefit of the lay reader of this dissent, the written opinion of Dr. Texon, the court's own doctor, reads in pertinent part as follows:
   "Discussion: The recurrence of chest pain in this patient with known coronary occlusive

In the face of this uncontroverted and undisputed medical testimony, I am unable to understand how my colleagues justify their characterization of this episode as a "bluff". I find even more disturbing the sinister implication in the majority's suggestion that appellant's symptoms "could have been self-induced". If the record indicates that appellant deliberately courted the possibility of another coronary infarct by "self-inducing" the condition which brought about his May 18 hospitalization, my brothers should say so. Insinuations, conjecture and suspicion, particularly when of a malicious nature, have no place in the opinions of this or any other court. *Hodgson v. Okada,* 472 F.2d 965, 969 (10th Cir. 1973); *Tyrrell v. Dobbs Investment Co.,* 337 F.2d 761, 765 (10th Cir. 1964); 89 C.J.S. Trial § 634 (1955). The uncontradicted medical proof was that appellant suffered a "true anginal episode" and that proper medical treatment mandated his hospitalization.[4]

Having now set the scene at the hospital, let us shift our attention to the courtroom to see what transpired there on the morning of May 18. So that the record will by crystal clear, a transcript of the proceedings is set forth in full in the margin.[5] As is

---

atherosclerosis and previous myocardial infarction raises the question of possible further acute myocardial infarction. For this reason the patient was properly advised by his personal physician to be evaluated in the Emergency Room and then admitted to the coronary care unit (Ames) at Mt. Sinai Hospital. The patient was closely monitored by Ekg. and blood studies beginning about 10 AM on 5/18/76. Ekgs. showed transient ST segment changes and no significant change in the blood enzymes to establish a diagnosis of acute myocardial infarction. The transient Ekg. changes (reverting to the previous state) indicated that the patient did have some transient myocardial ischemia. The absence of pulmonary congestion, fever, and cardiac irregularity together with the control of chest pain with medication strongly suggests that the episode of chest pain about 7 AM on 5/18/76 was another episode of angina pectoris—possibly more severe clinically than usual—but still reversible and not an episode of acute myocardial infarction. "Opinion: In view of the clinical course to date of chest pain as described but the absence of objective evidence of acute myocardial infarction in this patient, I believe 24 hours of further observation in the hospital are indicated. If improvement continues and no evidence of objective Ekg. or blood enzyme changes are [sic] found, I believe the patient may participate in a court procedure on Thursday, 5/20/76. Re-evaluation at appropriate intervals is advised."

I find no complicated medical terminology in Dr. Texon's statement that appellant was "properly" advised by his physician to be evaluated in the Emergency Room and then admitted to the coronary care unit. While this was "properly" taking place, the District Judge was improperly proceeding with the selection of the jury which subsequently found appellant guilty.

4. I find a curious inconsistency between my brothers' argument that appellant's anginal episode was a "bluff" predicated solely upon his complaint of pain and their further assertion that appellant's "other symptoms" could have been self-induced.

5. The Court: Is the Government ready to proceed?

Mr. Timbers: The Government is ready to proceed, your Honor.

The Court: Is the defendant ready to proceed?

Mr. Cooper: The defendant Pastor is not ready at this time.

The Court: Is the defendant Weiner ready to proceed?

Mr. Sparks: Yes, your Honor.

Mr. Cooper: If I may explain:

I received a call in my home at about 8:15 this morning from Mr. Kuh who is counsel of record in this case for Mr. Pastor. Mr. Kuh informed me that he had been informed by Mr. Pastor's wife that Mr. Pastor had another heart problem I believe early this morning; that she had to administer oxygen; that she could not even get Mr. Pastor clothed this morning he was in such bad shape.

Mr. Kuh further informed me that upon hearing that he called Dr. Texon, not having been able to reach Mr. Timbers, who I believe was on his way in from Connecticut. He asked Dr. Texon if he could go to the hotel where Mr. and Mrs. Pastor were staying and examine Mr. Pastor and, if necessary, admit him to the hospital. Dr. Texon said he could not do that; that he is not authorized by the Court to do that; that he doesn't have a Court order and therefore he would not do that.

I was informed that Mr. Kuh within the last 15 minutes called Dr. Texon again. Dr. Texon still said he was not able to go to Mr. Pastor. I believe Dr. Texon said that he would be in his office and if Mr. Pastor could get to his office he would be able to examine him there, but my information is that Mr. Pastor was not in condition even to be dressed, no less to go out of the room.

obvious from the quoted record, the District Judge, without any supporting medical information concerning appellant's then existing condition, decided that appellant was engaged in a "deliberate attempt to frustrate this Court in bringing this case to trial. . . ." She peremptorily rejected the request of appellant's attorney *and the suggestion of the United States Attorney* that "a determination be made first as to whether [appellant] is in fact sick before proceeding." She threatened appellant's counsel with contempt of court for simply attempting to ask a question. Finally, she revoked appellant's bail and ordered the United States Marshals to "go and get him." The District Judge's subsequent pique because the Marshal, faced with the inhumane task of forcibly removing appellant from the coronary care unit of the Mt. Sinai Hospital, failed to carry out her order, is disclosed in other portions of the record. This, my colleagues hold, constitutes proper judicial deference to the defendant's constitutional right to be present during the selection of the jury. I respectfully disagree.

In talking with Mr. Kuh in the last five minutes he told me that he also called Dr. Kuhn who was to get back to Mr. Kuh within the next ten minutes and inform him as to what his findings are. I don't know whether Dr. Kuhn will be able to see Mr. Pastor or not.

The Court: By when?

Mr. Cooper: He is going to call back in the next ten minutes. I don't think he will have seen him by then.

What I would request is this: I know Dr. Texon has been examining Mr. Pastor at the Court's direction. I would believe if Dr. Texon were ordered to examine him again that he would. I believe the reason Dr. Texon said he wouldn't at this time is because he wasn't authorized.

I would ask that the Court through a phone call at least now order Dr. Texon to examine Mr. Pastor at Mr. Pastor's hotel.

The Court: I don't have any doctor's certificate here, Mr. Cooper, saying that Mr. Pastor is unable to attend court this morning, so his bail is revoked and the United States Marshals are ordered now to go and get him. We are going to proceed in his absence.

Mr. Cooper: May I ask—

The Court: If you say another word you are going to need a lawyer.

Now, let's go.

(Pause.)

The Court: Mr. Timbers, do you have something to say?

Mr. Timbers: Yes, your Honor.

The Government is prepared to have Mr. Pastor examined and to have him placed in the Metropolitan Correctional Center if necessary. The Government would apply, however, to defer the selection of a jury to determine whether Mr. Pastor has purposefully absented himself from court today. The Government is concerned that if by chance Mr. Pastor should for once in fact be sick there might be Sixth Amendment problems in choosing a jury in his absence. The Government would apply at this time that a determination be made first as to whether he is in fact sick before proceeding.

Mr. Cooper: May I say something?

The Court: The application is denied.

Mr. Cooper: May I bring the Court up to date?

The Court: Yes.

Mr. Cooper: I spoke to Mr. Kuh against (sic). He said that he had spoken with Dr. Kuhn who in turn spoke with Dr. Texon. I believe it is the consensus of both Dr. Kuhn and Dr. Texon that Mr. Pastor should be examined. These arrangements were made before the Court made its previous order this morning.

Mr. Pastor, I believe, is at this time, if he has not already arrived, is on his way to Mount Sinai Hospital's emergency room either by ambulance or taxi, whichever was able to be arranged first. I believe Dr. Texon is aware of this fact now.

I would ask the Court that the Court's reason for revoking bail and ordering the marshals to get him because there was no doctor's note, to at least give us an hour to get the note. This set of circumstances was just brought to my attention and I believe just happened. It was not possible to get a doctor's note down here by that time.

The Court: The application is denied.

Mr. Cooper: If your Honor please, before we proceed I would make the same objections to having to go forward without Mr. Pastor at this time. I believe he has a right to be here until it is determined—

The Court: He has a right to be here, but he also has a responsibility to present a doctor's certificate saying that the is unable to be here. This is a deliberate attempt to frustrate this Court in bringing this case to trial and I'm not going to hear it again. That is my conclusion, that this was done deliberately to frustrate this Court from selecting a jury this morning at 9 o'clock as you full well knew as did Mr. Kuh and Mr. Pastor.

Mr. Cooper: You are not saying it is a deliberate attempt.

The Court: I just ruled that it is my view that it is because I changed the schedule and Mr. Kuh didn't like it, so we are going ahead. Let's go into the courtroom.

The wheels of justice would not have ground to a jarring halt if the District Judge had delayed the selection of a jury for only a short time in order that appellant's counsel might secure a medical report from his client's doctor. The holding of the District Judge that the failure of appellant's attorney to secure such a report between 8:00 A.M., when he first learned of appellant's attack, and 9:00 A.M., when court convened, constituted a "voluntary absence by the defendant", was completely arbitrary and unwarranted and flew squarely in the face of the Supreme Court's oft repeated admonition that "courts must indulge every reasonable presumption against the loss of constitutional rights." *Illinois v. Allen,* 397 U.S. 337, 343, 90 S.Ct. 1057, 1060, 25 L.Ed.2d 353 (1970); *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Moreover, because waiver of the constitutional right to be present throughout the trial is strictly personal to the defendant, it could not have occurred through the failure of his attorney to act with the alacrity which the District Judge demanded, even if the attorney was not blameless in this regard. *Cf. United States v. Crutcher,* 405 F.2d 239, 243 (2d Cir. 1968), *cert. denied,* 394 U.S. 908, 89 S.Ct. 1018, 22 L.Ed.2d 219 (1969); *Greenberg v. United States,* 280 F.2d 472, 475–76 (1st Cir. 1960). That the medical reports, for which the District Judge refused to wait, would have mandated a two day delay in the trial is uncontroverted, as is evidenced by the fact that, following Dr. Texon's testimony on May 19, the Judge adjourned further proceedings until May 20. If appellant was "bluffing" on the 18th, he was "bluffing" on the 19th; and the trial could have proceeded in his absence.

Looking back on events from the sanctity of this Court's ivory tower, my colleagues are critical of the fact that Dr. Kuhn was not called at 7:00 A.M. when appellant's onset of pain occurred and did not examine appellant until he reached Mt. Sinai Hospital, 180 minutes after the first "attack". (The quotes are my colleagues'.) They also criticize appellant's attorney for attempting to arrange for the court appointed physician to examine his client, brushing aside the attorney's explanation that he did not think the District Judge would believe appellant's own physician, a completely justifiable assumption, it would appear, from a review of the Judge's subsequent conduct. Can a finding that appellant intentionally waived his constitutional right to be present during the selection of the jury be constructed upon such a weak foundation as this? I think not.

My colleagues dig deep indeed to justify the District Judge's conduct on May 18 by referring to appellant's display of pills and a hospital wristband during the course of the trial[6] and his wearing of what they term a "see-through" shirt which permitted the jury to see the heart monitoring device attached to his chest.[7] If this was egregious conduct on the part of an ill and hospitalized defendant, which is a matter not at all free from doubt, it certainly cannot be relied upon as justification for improper conduct of the District Judge which took place before the trial commenced.

The majority also relies on the rule that where an evidentiary hearing is conducted to determine whether appellant voluntarily absented himself from trial, "the trial judge's findings *which form the basis of his or her decision on the issue* will not be disturbed unless found to be clearly errone-

---

**6.** Except for the periods when he was required to be in court, appellant was hospitalized under court ordered guard throughout the course of the trial, remaining in the coronary care unit of Mt. Sinai Hospital until May 25, at which time he was transferred to a private room. If appellant was "bluffing", as my brothers so knowledgeably conclude, the naiveté of the professionally trained medical personnel at Mt. Sinai Hospital, who kept him in the coronary care

unit until May 25th, closely monitoring his heart throughout this time, borders upon the incredible.

**7.** The District Judge described the shirt as a "light shirt through which the jurors could see a bandage on his chest which covered certain electrical contacts necessary for certain monitoring or treatment which he was receiving at the hospital."

ous." (Emphasis added.) However, the record is clear that the District Judge conducted no hearing of any sort prior to ordering the selection of a jury. The findings upon which my brothers rely so heavily were made in an opinion filed in support of an oral order denying a Rule 33 motion for a new trial. Although the order was made in open court prior to the taking of the appeal, the opinion was not filed until several months thereafter, which was subsequent to the filing of the record on appeal and appellant's brief.

We have said on numerous occasions that the docketing of an appeal wholly removes the case from the jurisdiction of the trial court and deprives it of the power to make any further orders. *United States v. Ellenbogen,* 390 F.2d 537, 542 (2d Cir.), *cert. denied,* 393 U.S. 918, 89 S.Ct. 241, 21 L.Ed.2d 206 (1968); *United States v. Habib,* 72 F.2d 271 (2d Cir. 1934). In *United States v. Warren,* 453 F.2d 738, 744 (2d Cir.), *cert. denied,* 406 U.S. 944, 92 S.Ct. 2040, 32 L.Ed.2d 331 (1972), we specifically held that, once a notice of appeal has been filed, the District Court is deprived of jurisdiction to act upon motions for a new trial. There is, therefore, a serious question in my mind whether a District Judge can retain jurisdiction following the taking of an appeal from a judgment of conviction by the simple expedient of making an oral order and reserving the right to file supportive findings at a later date.[8]

Assuming, however, that we are prepared to treat the District Judge's opinion as something other than an additional appellee's brief, a strong argument may nonetheless be made that we should not be bound by the *ex post facto* findings contained therein. The District Judge did not order the case to trial on the basis of these post trial findings, but, instead, proceeded solely

upon her own arbitrary determination that appellant was engaged in a deliberate attempt to frustrate the court in bringing the case to trial. If full and complete review of this procedure can be thwarted through application of the "clearly erroneous" rule to exculpatory post trial findings by the trial court, a defendant's constitutional rights rest on rather shaky grounds. It will be the rare judge indeed who does not find his own conduct to have been blameless. *See Fielding v. LeFevre,* 548 F.2d 1102, 1104 n. 1 (2d Cir. 1977). Where, as here, the judge departs from her role as impartial arbiter over matters in dispute between litigants and takes an adversary posture against one of them, contrary to the wishes and suggestions of both, substantial justice for the injured party might well require that subsequent findings, made in attempted justification of the judge's conduct, be given closer scrutiny than is mandated by the "clearly erroneous" rule. *Cf. United States v. Robin,* 553 F.2d 8, 10 (2d Cir. 1977); *Holley v. Lavine,* 553 F.2d 845, 851 (2d Cir. 1977); *Halliday v. United States,* 380 F.2d 270, 272–74 (1st Cir. 1967).

I do not rest my dissent on this argument, however, because I conclude that the District Judge's finding that appellant did not suffer a physiological impairment so severe and so serious as to excuse his absence from court on the morning of May 18 was in direct contradiction of the undisputed medical evidence and was therefore clearly erroneous. I also conclude that the District Judge was patently in error in holding that the failure of appellant's attorney to have a medical report available for the court at 9:00 A.M. on May 18 constituted a voluntary absence by appellant and a knowing and intentional waiver of his constitutional right to participate in the selection of the jury.

---

**8.** Lest there be any implication that appellant committed some additional impropriety in perfecting his appeal in a timely manner, I point out that the sentence imposed upon him was stayed on condition that that appeal be promptly perfected within the time allowed by the rules.

Reference to the judgment of conviction also discloses that the District Judge recommended to the Attorney General that appellant be confined to an institution "with appropriate facilities for his heart condition." This was done, I presume, so that medical help would be available in the event appellant "bluffed" another heart seizure.

My brothers say that I err in basing my dissent on what transpired on the morning of May 18, 1976. They prefer to rely upon events which occurred six months earlier and one week later. The District Judge's specific holding was that appellant's failure to have a doctor's statement in court at 9:00 A.M. on May 18, 1976 constituted a voluntary absence and justified starting the trial without appellant being present to participate in the selection of the jury. His lawyer's failure to produce this statement did not occur in 1965 or later in 1966; it occurred on May 18, 1976.

My position, simply put, is that if there was not "persuasive evidence of a knowing and intelligent waiver on the part of [appellant] himself," *Humphrey v. Cady*, 405 U.S. 504, 517, 92 S.Ct. 1048, 1056, 31 L.Ed.2d 394 (1972), rather than a "choice made by counsel not participated in by [appellant]," *Fay v. Noia,* 372 U.S. 391, 439, 83 S.Ct. 822, 849, 9 L.Ed.2d 837 (1963), the District Judge's finding of waiver based upon the attorney's questionable lack of diligence cannot stand.

My further position, also simply put, is that appellant's right to absent himself on the morning of May 18, 1976 should not be determined by what his physical condition was in September 1965, or by the gruesome test of whether he survived the trial. If appellant was properly in Mt. Sinai Hospital while the District Judge was proceeding with the selection of his jury, the trial should not have proceeded in his absence. On this crucial issue, I do not consider only the evidence tending to support appellant's contentions, as the majority opinion seems to imply. *Both* appellant's doctor and the court-appointed doctor agreed that appellant's hospitalization on May 18, 1976 was proper. As to this salient feature of the case, there was no other medical testimony. This was it. This was the opinion of both the partial and the impartial physician, each of whom was completely familiar with appellant's medical history and, despite the omniscience of Federal judges, was better

qualified than we to pass upon the necessity for appellant's hospitalization.

With all due respect to my colleagues, their argument concerning indefinite adjournments which "probably" would have occurred, severance, separate trials, etc., would, if advanced by a litigant, be properly termed a "red herring". No one quarrels with the right of a District Judge to proceed with a trial, with or without the defendant being present, when there is medical proof that the defendant is physically able to be present and participate in the trial. The undisputed, I repeat, undisputed proof was that on the morning of May 18, 1976, appellant was properly hospitalized and therefore physically unable to be present.

It is not a pleasant task to pass critical judgment upon the conduct of another judge, and the easy road for me would be to join with my colleagues in their facile approval of what has transpired in this case. However, if we judges are to be consistent in our application of constitutional principles, we should hold ourselves to no less exacting standards than those we demand of police officers who are not blessed, as we are, with legal degrees and presumed knowledge of the law. *See, e. g., United States v. Karathanos,* 531 F.2d 26, cert. denied, 428 U.S. 910, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976); *United States v. Magda,* 547 F.2d 756, 759 (2d Cir. 1976) (Motley, *J.,* dissenting). In this manner only can the "high reputation of federal criminal justice and the policy of complete and even-handed fairness for the defendant" be maintained. *United States v. Fernandez,* 480 F.2d 726, 738 (2d Cir. 1973).[9] Recognizing, as we do, that the extreme pressures on our trial judges sometimes cause them to "give vent to their frustrations," *United States v. Nazzaro,* 472 F.2d 302, 304 (2d Cir. 1973), we have said that "grave errors which result in serious prejudice to a defendant cannot be ignored simply because they grow out of

---

**9.** If public respect and support for our judicial system is to be maintained, it is important not only that justice be done, but that it appear to be done. The appearance of justice takes on

added significance in this case because of the District Judge's prior denial of appellant's motion that she recuse herself because of alleged bias and prejudice against him.

difficult conditions." *Id.* Because I am convinced that the District Judge committed grave prejudicial error which this Court should neither ignore nor condone, *see United States v. Toliver,* 541 F.2d 958, 964 (2d Cir. 1976), I respectfully dissent from the affirmance of appellant Pastor's conviction and vote to remand for a new trial.

I agree with my brothers that the judgment of appellant Weiner should be affirmed.