USA v. Yannai

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2014

(Argued:  November 19, 2014                    Decided: June 25, 2015)

Docket No. 13-4466

_____

UNITED STATES OF AMERICA,

<u>Appellee</u>,

- v. -

JOSEPH YANNAI,

<u>Defendant-Appellant</u>.

_____

Before:  KEARSE, JACOBS, and RAGGI, <u>Circuit Judges</u>.

Appeal from a judgment of the United States District Court for the Eastern District of New York, Edward R. Korman, <u>Judge</u>, convicting defendant of violation of the Mann Act, 18 U.S.C. § 2422, labor offenses, 18 U.S.C. §§ 1351, 1589, and offenses with regard to the importation and employment of aliens, 8 U.S.C. §§ 1324, 1328, following a jury verdict entered in defendant's absence.  Defendant argues that his right to be present at trial was violated by the district court's refusal to delay the final stage of trial when he was unconscious and hospitalized, and by its refusal to grant a mistrial or a new trial, refusals based on the court's finding that defendant had waived his right to be present by deliberately overdosing on prescription drugs.

Judgment affirmed; remanded for clerical correction.

HILARY L. JAGER, Assistant United States Attorney, Brooklyn, New York (Loretta E. Lynch, United States Attorney for the Eastern District of New York, Jo Ann M. Navickas, Daniel A. Spector, Assistant United States Attorneys, Audrey E. Stone, Special Assistant United States Attorney, Brooklyn, New York, on the brief), for Appellee.

GEORGIA J. HINDE, New York, New York (Neil B. Checkman, New York, New York, on the brief), for Defendant-Appellant.

KEARSE, Circuit Judge:

Defendant Joseph Yannai appeals from a judgment entered in the United States District Court for the Eastern District of New York following a jury trial before Edward R. Korman, Judge, convicting him of enticement and coercion of others to travel in interstate and foreign commerce to engage in sexual activity, in violation of 18 U.S.C. § 2422; forced labor and attempted forced labor, in violation of 18 U.S.C. § 1589; fraud in foreign labor contracting, in violation of 18 U.S.C. § 1351; importation of aliens for immoral purposes, in violation of 8 U.S.C. § 1328; inducement of an alien to illegally enter and reside in the United States, in violation of 8 U.S.C. § 1324; and unlawful employment of aliens, in violation of 8 U.S.C. § 1324 [sic]. Yannai was sentenced principally to 132 months' imprisonment, to be followed by a three-year term of supervised release. The jury's verdict was returned while Yannai was hospitalized after having overdosed on prescription medication. On appeal, he contends principally that his right to be present at trial was violated by the district court's refusals to adjourn the trial for more than one day or to grant him a mistrial or a new trial, based on its finding that Yannai had waived that right because the overdose was intentional and his absence

was voluntary. He also contends that the resumption of trial after a continuance of no longer than one day was prejudicial to him because jurors were exposed to media reports that his absence was due to an attempt to commit suicide. Finding no basis for reversal, we affirm.

We remand only for a clerical correction of the judgment to state that the section violated by Yannai's unlawful employment of aliens was 8 U.S.C. § 1324a, rather than § 1324.

## I. BACKGROUND

On August 3, 2010, while Yannai was facing New York State charges of labor trafficking and sexual abuse, he was arrested on related federal charges. A superseding federal indictment ("Indictment") alleged that from approximately 2003 to 2009, Yannai used the Internet to lure young women to the United States with offers of employment as his assistant at his home in Pound Ridge, New York. In so doing, he often represented that he was a woman named "Joanna" or "Sylvia" who had previously worked as a Yannai assistant. The Indictment alleged that Yannai chose young women, mostly between the ages of 18 and 25, based on their photographs and their willingness to live in his house. He instructed the selected women to travel to the United States on tourist visas and to conceal their work plans from immigration authorities. The Indictment alleged that after the women arrived at his home, Yannai limited their contact with the outside world and abused them sexually.

Except as indicated, the following facts are not in dispute. Some are reflected in documents filed under seal, which are hereby deemed unsealed to the extent that their contents are quoted or described in this opinion.

3

A. Yannai's First Overdose

On August 3, 2010, when federal agents arrived at the home of Yannai and his wife to arrest him, Yannai deliberately swallowed a large number of pills in an attempt to commit suicide. Yannai had learned of the impending federal charges and had planned for months to commit suicide, stockpiling pills for the day when federal agents came to arrest him. Shortly after taking the pills, Yannai collapsed and was taken by ambulance to a hospital, where he was intubated. A toxicology screen of his urine was positive for benzodiazepine, a class of drugs that includes diazepam and temazepam. Valium--a brand name for diazepam--is commonly taken during waking hours to reduce anxiety; temazepam--also known by the brand name Restoril--is a type of sleeping pill to be ingested at bedtime. Although a tox screen showing benzodiazepine does not distinguish between diazepam and temazepam, at least one August 2010 hospital record indicated that Yannai had overdosed on Valium.

According to hospital records, on the day after that overdose Yannai, while sedated, indicated to the medical staff that he had overdosed intentionally and that he was still suicidal. Asked why, he mouthed the words "I'm finished." On the following day, prior to his release into federal custody, Yannai stated that he felt hopeless about his legal prospects and that he would attempt to commit suicide again rather than go to prison.

B. Pre-Trial Proceedings and the Trial Evidence

At Yannai's August 11, 2010 bail hearing, the government sought a permanent order of detention, arguing principally that his admitted suicide attempt and his statements to hospital staff demonstrated that he posed an extreme risk of flight. At the hearing, Yannai testified that when the

4

agents came to arrest him on August 3, he attempted to commit suicide because he did not want to go to jail (see Detention Hearing Transcript, August 11, 2011 ("Bail Tr."), at 35, 42); he said the pills he ingested at that time were sleeping pills, although he did not know what they were called (see id. at 43), but they were not Valium (see id. at 50). Yannai testified that after taking the pills he was unconscious for two days (see id. at 43), and he admitted that after regaining consciousness, he told hospital staff that he would try to commit suicide again (see id. at 51-52).

Yannai testified that he would not attempt to commit suicide again if released on bail, however, explaining that he realized, after a conversation with his wife, that his earlier attempt was a mistake. And he indicated that, after meeting his attorney in the present case, he felt a renewed determination to fight the federal charges. The magistrate judge found Yannai's testimony persuasive and ordered his release on a $500,000 secured bond.

Yannai was unable to provide suitable security, however, and remained in custody for several months. He eventually appealed to the district judge to reduce the amount of the required bond. The government again objected to Yannai's release, arguing that as the proceedings progressed it would become increasingly clear to Yannai that he would be convicted and would face a lengthy term of imprisonment. It argued that Yannai's prior conduct raised a very serious concern that if Yannai were on pretrial release, he would eventually fail to appear in court or would again attempt suicide.

The district court was persuaded to reduce the amount of the bond to $125,000. The court observed, inter alia, that Yannai had abided by bail conditions imposed in connection with his state prosecution and that the Bureau of Prisons had taken him off of suicide watch. Yannai promptly satisfied the reduced bond and was released on bail.

Yannai's trial began on May 23, 2011. The government's evidence included testimony from an investigator who had analyzed Yannai's computer and found at least 1,500 form emails written from the perspective of a supposed former Yannai assistant, sometimes signed "Joanna" or "Sylvia," and addressed to various women whom Yannai sought to interest in his purported employment offer. Five women testified to the emails they had received from Yannai in his own name and emails from purported former Yannai assistants named "Joanna" or "Sylvia" using language substantially identical to the form emails found by the investigator on Yannai's computer. The women testified that they accepted Yannai's offers of employment and were instructed by email to lie to immigration authorities and state that the purpose of their trips was tourism rather than work. They testified that after they arrived to work for Yannai, he subjected them to sexual abuse, including forcible kissing, groping their breasts, digitally penetrating one woman, and attempting to force another to perform oral sex on him.

On May 26, the parties rested their cases, and the court adjourned trial until Tuesday May 31. On May 31, the court held a charge conference at which the court's instructions to the jury were finalized. The parties then delivered their summations.

C. Yannai's Second Overdose and the Remainder of Trial

On Wednesday morning June 1, Yannai failed to appear in court. Defense counsel reported that Yannai had collapsed at a gas station on his way to the courthouse and was in a hospital emergency room; soon thereafter, the government reported that Yannai was unconscious and that the medical personnel were unsure of the nature of his problem. (See Trial Transcript ("Trial Tr.") 1165, 1168.) The Assistant United States Attorney reminded the court of the government's previously

6

expressed concerns about the risk of flight or suicide, and he asked the court to issue a subpoena for Yannai's medical records, arguing that toxicology results might confirm that Yannai had again attempted suicide. The court denied the request on the ground that it was premature. The court dismissed the jury for the day and made arrangements for the jurors to telephone the court at the end of the day to learn when they would be required to return (see id. at 1172-74); the parties attempted to gather further information as to Yannai's condition and the circumstances of his collapse.

After a recess, the government reported on a conversation between a hospital psychiatrist and government case agents from whom the psychiatrist had sought information as to whether Yannai had a history of overdosing; the psychiatrist asked the agents because Yannai's wife had denied such a history and her denial conflicted with Yannai's medical records. The psychiatrist told the case agents that Yannai appeared to have attempted to commit suicide by overdosing. Yannai was still unconscious but was expected to recover fully. (See Trial Tr. 1179.)

Defense counsel, after speaking on the telephone with the psychiatrist (albeit assuming at the time of the conversation that he was simply the emergency room physician (see id. at 1182-83)), relayed to the court the psychiatrist's statement that Yannai might be released from the hospital as early as the next day but that "[i]t might be a couple of more days" before he would be "physically able to be released" (id. at 1180-81). Counsel indicated that, as to whether Yannai had attempted suicide, the hospital's findings were inconclusive, but that the psychiatrist's best guess was that he had overdosed. (See id. at 1181-82.)

The court thereafter, with counsel present, spoke by telephone conference with the psychiatrist and Yannai's primary attending physician--an internist--to learn their evaluations first-hand. The psychiatrist stated that he had been called in "[b]ecause it appeared that the most likely

cause for" Yannai's condition "was an overdose of medication" and because Yannai's medical records "indicated that the gentleman has a history of suicide attempt in the past." (Trial Tr. 1186.) The psychiatrist added that

> it was the opinion of the physicians in his care, that includes the emergency room physician who initially evaluated him when he arrived, and [the internist], who was asked to admit him to the hospital when the emergency department determined that he needed to be admitted to the hos[]pital. It was their opinion that the most likely explanation for his being unconscious at the present time was that--was due to an overdose of Valium or some such medication.

(Id. at 1187.)

The internist agreed. She said that various other causes had been eliminated based on the stability of Yannai's electrolytes and vital signs and the absence of any acute changes; she stated that Yannai's "urine tox [wa]s positive for Benzodiazepine and amphetamine." (Id. at 1188.) She said that the psychiatrist was involved because "this is likely an overdose case." (Id. at 1188-89.) She described Yannai as "pretty unresponsive" and predicted that he would probably awaken in one or two days. (Id. at 1189.)

Following receipt of these evaluations, the court found that Yannai had voluntarily absented himself from the criminal proceedings. Defense counsel objected, stating that, although "[i]t appears to be an overdose," there was "no conclusion from the doctors that this was a suicide attempt or an intentional overdose." (Id. at 1191.) The court found, however, that the overdose was intentional:

> [F]irst of all, they've told me what they've ruled out which is what I asked the doctor and they've ruled out a number of causes.
>
> Second, the overdose that he's had is not two pills. It's not three pills. And it was a combination of amphetamines and Valium . . . .

8

And he has a propensity to do this. He's done it once before. . . . I think I have a sufficient basis to conclude that this was the result of a voluntary act.

(Id.)

Defense counsel argued that Yannai had attended trial on a timely basis every day and "was on his way to court today," and that hence there was no basis for the court to find that Yannai "willingly absented himself from today's proceedings." (Id. at 1193-94.) The court disagreed, stating,

[w]ell, I have a doctor's opinion that it was likely that he did. I have doctors who tell me they've ruled out other possible causes. And this is not the first time.

(Id. at 1194.)

The court noted that Yannai had been present from the beginning of the trial through the summations, and through the final discussion of the instructions to be given to the jury, and that "he's got a right to be here" for the jury charge and during the period of jury deliberations "if he wanted to be here[, a]nd if he didn't voluntarily absent himself." (Id. at 1191-92.) The court concluded, however, that the charge and deliberations period are stages at which Yannai would have absolutely "nothing to contribute" (id. at 1192, 1193), that it was convinced that its "factual finding is an accurate one," and that on balance it was appropriate to proceed with the trial, which would resume at noon the next day (id. at 1193). The court stated that if the trial were still at an "evidentiary" stage, "the balance might be the other way." (Id.)

On the following day, Thursday, with Yannai still unconscious, defense counsel renewed their objection to the resumption of trial in his absence, arguing that they could not know the reason for his collapse until they had an opportunity to speak with him. The government reported that the doctors thought "the earliest" that Yannai "could possibly be released would . . . be late Friday

9

night or Saturday." (Trial Tr. 1204.) The district court adhered to its decision to proceed with the trial. It stated that Yannai might have overdosed intentionally for a purpose other than suicide, suggesting that "[m]aybe he thought he might make it to the courthouse and actually carry on a scene here." (Id. at 1203.) But regardless of whether Yannai's purpose was suicide or merely disruption of the trial proceedings, the court found that "the objective evidence strongly suggests certainly by more likely than not, and possibly beyond a reasonable doubt, that this was a deliberate act." (Id.; see, e.g., id. at 1204 ("Based on this record, . . . it's quite clear that this was a deliberate act.").)

Defense counsel asked that the court inform the jury that Yannai was in the hospital. Over the government's objection, the court agreed. It preceded its instructions on the law by telling the jury,

> you may have noticed that the defendant, Joseph Yannai is not present here. He was hospitalized yesterday. It's not serious. He's likely to be released within the next day or two but under the law, under these circumstances I could proceed in his absence and that's what I am going to do.

(Id. at 1207.) After receiving the court's instructions, the jury began its deliberations. That afternoon, the jury sent the court five notes. Two requested clarification on issues of law; one requested copies of the trial transcript and emails introduced at trial; one requested a break in order for two jurors to pray; and the final note asked to rehear some of the trial testimony.

On Friday morning June 3, two jurors submitted notes to the court stating they had heard that Yannai had attempted suicide. The court consulted with counsel and questioned those two jurors and one other juror who had heard such a report. After each of those jurors stated that what he had heard would not affect his ability to continue as a fair and impartial juror, defense counsel stated that they "d[id]n't have any applications at th[at] point." (Trial Tr. 1336.) The jury resumed deliberations.

10

At approximately 2:15 that afternoon, defense counsel informed the court that Yannai was awake and lucid, and they asked and received permission to speak with him privately by telephone. Following a recess, Yannai's counsel stated as follows:

> MR. SCHNEIDER: Just now about ten to 4:00, I understand we have a note from the jury saying they've reached a verdict. We were able to finally speak to our client, Mr. Yannai, about 3:15, I think, something like that. We spoke to him on the phone from his hospital bed in White Plains. He told us that he did not intentionally overdose on any medications. He certainly did not intend to kill himself.
>
> He does take Valium to sleep and <u>he had taken Valium the night before but he woke up in the morning, put on his best suit and came down to court here</u>. He was feeling very confident, he said after the summations. He felt-- was feeling bad and dizzy as he drove near White Plains. He passed White Plains on the Hutchinson Parkway and pulled off at a gas station and that was the last thing he remembered until he just woke up today.

(Trial Tr. 1345-46 (emphasis added).) Counsel stated that, given the hospital information that there were

> metabolites of Valium in his system, we don't believe that the finding that he voluntarily absented himself was correct. And at this point, he has missed not only the jury charge but lengthy discussions, especially yesterday concerning the juror questions that were sent about the jury charge.
>
> He had a right to be present during those discussions and he wasn't. So at this point, we're moving for a mistrial and that the jury be discharged.

(Id. at 1346-47.)

The court denied the motion, stating that it would not grant a mistrial on the basis of Yannai's statement, which was not only "unsworn" but "implausible," especially as the doctors had also found amphetamines in his system and as he had made a "prior [suicide] attempt." (Id. at 1347.) The court remarked that "if you take one or two Valiums before you go" to bed, "this is not going to happen the next day. . . . He's not going to sleep for two days." (Id. at 1348.)

11

Thereafter, the jury returned its verdict, with Yannai listening by telephone. The jury found him guilty on all counts. Yannai remained hospitalized for another week.

D.  Yannai's Motion for a New Trial

In March 2012, represented by new counsel, Yannai moved pursuant to Fed. R. Crim. P. 33 for a new trial, arguing principally that the district court had erred by continuing the trial in his absence after his second overdose. In support of his motion, Yannai submitted his own declaration and the declarations of his personal physician and one of his trial attorneys. Yannai's declaration stated in part as follows:

> In August of 2010, when federal agents came to arrest me on the charges in this case, I felt desperate, hopeless and succumbed to despair by swallowing a large number of sleeping pills. That was an intentional act. The pills I took at that time were not Valium, but some other prescription I had to help me sleep.

(Declaration of Joseph Yannai dated February 23, 2012 ("Yannai Decl."), ¶ 3.) Yannai stated that during this prosecution, he was experiencing severe leg and back pain that made it difficult for him to sleep.

> In order to get some sleep so that I could be as alert as possible when meeting with my attorneys and, later, at my trial, I began to take Valium tablets in the evenings to help me sleep. I never took excessive amounts: only two or three tablets at a time. Whenever I woke during the night and could not get back to sleep--which occurred several times a night--I took another two or three tablets.

(Id. ¶ 6 (emphases added).) With respect to the night of May 31, Yannai stated:

> As usual, I had difficulties sleeping that night and took two or three Valium tablets before I went to bed and whenever I woke up, because I wanted to get as much sleep as possible before returning to Court. I did not take anything other than my usual medications that day and evening. The next morning, I felt better than I had on the morning before, so I drove to Court instead of

12

calling a car service. I began to feel dizzy after about 40 minutes, however, so I pulled over at a gas station, intending to rest a few minutes before continuing my drive. Instead, I woke up in a hospital bed.

(Id. ¶ 9 (emphases added).) Yannai assured the court that he "did not want to stop the trial," that he "did want to be there, to participate in any way I could," and that he did want to "see it through to the end." (Id. ¶ 10.) He said his failure to attend trial on June 1 "was not . . . the result of any intentional act on my part." (Id.)

The declaration of Yannai's trial attorney stated that Yannai had been an active, engaged, and positive participant in his trial preparations, and that after summations Yannai had told the attorney that he felt very optimistic about the trial's outcome. The declaration of Yannai's personal physician advanced the view that the most likely cause of Yannai's second overdose was an accidental residual sedative buildup as a result of his frequent use of benzodiazepine drugs for sleep. The physician also stated that Yannai's positive test result for amphetamine could be explained by pills the physician had prescribed to Yannai for narcolepsy or by certain over-the-counter medicines such as Sudafed; and he suggested that accidental carbon monoxide poisoning from Yannai's very old car could have contributed to his collapse on June 1.

In opposition to Yannai's new-trial motion, the government submitted the declaration of toxicologist Elizabeth Spratt, who estimated that Yannai's declaration that he took two or three Valium tablets several times during the night before his nonappearance in court, i.e., at most 12 pills, severely underreported his Valium intake. She noted that the strongest dosage of Valium available for legal sale is 10-milligram tablets; thus, if the declaration were accurate, Yannai would have ingested no more than 120 milligrams of Valium. However,

[a]ccording to Yannai's medical records he is 240 pounds . . . . For an individual of his size a dose of even 120 milligrams would not result in the

collapse and coma that transpired on June 1, 2011 and continued until June 3, 2001. Instead, a much larger dose of at least 380 milligrams taken would be required to cause such a result in a man of Yannai's size. Even assuming Yannai took 10mg tablets (the largest available tablet size), Yannai would have needed to ingest 38 pills within a short period of time to cause himself to slip into a 3-day coma-like state. Ingestion of such a large quantity of pills necessarily demonstrates that Yannai purposefully overdosed on valium.

(Declaration of Elizabeth Spratt signed June 28, 2012 ("Spratt Decl."), ¶ 5.) Spratt also disputed Yannai's physician's residual-buildup theory. She opined that Yannai "almost certainly ingested the valium[,] identified in his urine test at White Plains hospital[,] after awakening in the morning, either shortly before or during his drive from Northern Westchester to Brooklyn" on June 1, because if he had ingested the

valium during the course of the night, it would not have been possible that he woke up alert and ready to drive only to then become overcome with dizziness and pass out 40 minutes into the drive. Instead, he would have remained asleep in his bed.

(Id. ¶¶ 7, 6.)

Yannai, in reply, submitted the declaration of toxicologist Dr. Richard A. Stripp, who disputed Spratt's conclusions, stating that her calculations ignored relevant individual variables and that her conclusions could not be supported simply by a urine toxicology screen test without further blood or plasma tests, which were never performed. (Declaration of Richard A. Stripp, dated September 27, 2012 ("Stripp Decl."), ¶¶ 7-8, 11-12.) He too concluded, however, that "the available medical evidence [wa]s adequate to establish that Mr. Yannai likely succumbed to an overdose of a benzodiazepine-based drug such as Valium . . . ." (Id. ¶ 14.)

In addition to these declarations and expert opinions, the government submitted medical records related to Yannai's second overdose. These records for June 1, 2, and 3 indicated that hospital staff had performed chemical and toxicology tests on Yannai and had consistently found that

14

his condition was most likely caused by a deliberate overdose of benzodiazepine. They included the psychiatrist's report that on June 3, 2011, Yannai said he could not be sure just how many pills he had taken in the early morning hours of June 1; he said he had taken "a bunch" at a time; and he had taken the last "maybe at 5AM."

Finally, a court-appointed toxicologist, Dr. Harry A. Milman, gave his opinions in a February 25, 2013 written report ("Milman Report") and at a toxicology hearing (see Hearing Transcript, July 11, 2013 ("Tox. Tr.")), after examining Yannai's medical records and receiving what Yannai represented were his three most recent prescriptions for benzodiazepine drugs. Dr. Milman testified that the Yannai statement that he had ingested a bunch of Valium at 5:00 a.m. on June 1, 2011, was consistent with his falling unconscious shortly after he began his drive to court only if he took at least 24 5mg Valium pills that morning. (See Tox. Tr. 72, 78.) But Dr. Milman noted that Yannai's last prescription for Valium, according to the information provided by Yannai, was for 30 pills, 5mg each, in 2007. (See, e.g., id. at 17, 20, 25, 47.) Thereafter, in 2009 and 2010, Yannai had been prescribed 30mg tablets of temazepam. (See id. at 17.) Dr. Milman opined that on June 1, 2011, Yannai had likely overdosed not on Valium but instead on temazepam. (See id. at 17-18; Milman Report at 33.) He estimated the quantity at 4-10 temazepam pills; he was "confident . . . within a reasonable degree of scientific certainty" that Yannai had taken "at least four" temazepam pills. (Tox. Tr. 17-18; see also id. at 37.) He had "less confidence" in his estimate as it got "closer to ten," saying, "more likely than not, he took at least four. He may have taken more than four but I have no evidence that he did." (Id. at 18.)

In his written report, Dr. Milman had opined that Yannai's overdose on temazepam on June 1, 2011, was most likely accidental (see Milman Report at 32), in part because he believed that

"Yannai considered temazepam and diazepam the same drug and used the term Valium generically to describe both benzodiazepine drugs" (id. at 18-19). However, at the hearing Dr. Milman noted that he had not spoken with Yannai and that when he wrote his report he was not aware of either (a) Yannai's statements in his February 2012 declaration that the pills he took during the night of May 31, 2011, were Valium or (b) his statements in both that declaration and his bail hearing testimony that the pills he took in August 2010 were sleeping pills and not Valium. (See, e.g., Tox. Tr. 36, 44-45, 51-52.) After learning that Yannai had expressly distinguished between Valium and sleeping pills, Dr. Milman retreated from his conclusion that Yannai did not know the difference. (See id. at 44-46.) However, he stated, "I'm not sure how much [Yannai] understood" (id. at 46), and he remained of the view that the drug Yannai took in 2011 was temazepam rather than Valium (see generally id. at 59-60, 62, 72), although based on the available information, there was "no way to know which drug [Yannai] actually took" for either overdose (Tox. Tr. 22-23).

Dr. Milman, who was not a psychiatrist or a physician (see Tox. Tr. 13, 33), testified that he could not "determin[e] to a degree of scientific certainty . . . whether or not Mr. Yannai attempted to commit suicide or intentionally ingested an overdose of th[]e drugs" found in his system (id. at 13 (emphasis added)). But leaving aside purpose, Dr. Milman testified variously that if Yannai took only four temazepam pills the overdose was likely accidental (see id. at 72 ("my confidence is good on the low end that if he took four pills, it was accidental")); but that as Yannai's temazepam prescription called for one pill, taken at bedtime, the ingestion of four or more was a "deliberate," "intentional" overdose (e.g., id. at 32 ("he was prescribed one tablet . . . . So anything above that and anything contrary to that is deliberate."); id. at 14 ("he was prescribed one tablet Temazepam 30 mgs at bedtime. So, if he ingested more than one, obviously it was intentional . . . .")). Dr. Milman said

he "ha[d] no evidence that [Yannai] tried to commit suicide" or "tried to disrupt the hearing" (id. at 18), but he "didn't rule out" those goals as "possibilit[ies]" (id. at 30).

Prior to scheduling the toxicology hearing, the court had invited Yannai and his wife to provide the court with their testimony. Both declined. Prior to the hearing, the court had also opined that Yannai should have the burden of proving that his overdose was not intentional. (See Status Conference Transcript, April 25, 2013 ("April 2013 Tr."), at 22-23.)

In September 2013, at Yannai's sentencing hearing, the district court denied the motion for a new trial. The court found the experts' opinions generally unhelpful with respect to Yannai's purpose in overdosing, noting that it was "beyond the expertise of a toxicologist" to opine on questions of intent based solely on the amount of drugs in a person's system (Sentencing Hearing Transcript, September 23, 2013 ("Sent'g Tr."), at 12), and noting that Yannai had failed to provide answers to critical questions (see id.). The court found, however, that Yannai's declaration disclosed that he "was popping pills the whole night before" his June 1 nonappearance (id.); that Yannai's declaration that the pills taken that night were Valium was not credible (see id. at 10; see also id. (also noting that "Dr. Milman didn't believe that he took Valium")); that Yannai "clearly understood the difference" between sleeping pills and Valium (id. at 11); and that the doctors at the hospital "at the very least established that he took an overdose of pills for the second time in the course of this criminal proceeding" (id. at 16). The court found that, "more likely than not," Yannai overdosed deliberately. (Id. at 18-19.)

The court also, in addition to adhering to its prior view that Yannai would have nothing to contribute to the parts of the trial that he missed, stated that the case against Yannai was "overwhelming" and that it was "inconceivable . . . by any standard" that the "result would have been

17

differen[t] had [Yannai] been present." (Sent'g Tr. 17.) The court noted further that Yannai was in the hospital for 10 days following this overdose and that granting him a continuance for 10 days would have caused a considerable disruption for the jurors, as well as prolonging the interval between their hearing the evidence and beginning deliberations. It also observed that a new trial would, inter alia, force the witnesses victimized by Yannai to endure the "burden and trauma of having to testify again." (Id. at 14.) The court found no merit in Yannai's contention that a new trial was warranted because some jurors heard on June 2, 2011, that he had attempted suicide. The jurors at issue were appropriately questioned, and there was no defense request for anything more. (See id. at 23-24.)

The court sentenced Yannai principally, as indicated above, to 132 months' imprisonment.

## II. DISCUSSION

On appeal, Yannai contends that the district court erred in continuing his trial after only a one-day adjournment based on the finding that he waived his right to be present by deliberately overdosing on prescription drugs. He argues principally that the court erred in (a) "plac[ing] the burden of proof on the defendant" to show lack of voluntariness (Yannai brief on appeal at 50); (b) finding that his absence was voluntary; (c) failing to find that an additional two-day adjournment would serve the public interest; and (d) failing to find that Yannai was prejudiced by the lack of a two-day continuance after jurors were exposed to media reports that he had attempted suicide. For the reasons that follow, we are unpersuaded.

18

A. The Right To Be Present; Principles of Waiver

An accused's right to be present at his trial is "[o]ne of the most basic of the rights guaranteed by the Confrontation Clause" of the Sixth Amendment. Illinois v. Allen, 397 U.S. 337, 338 (1970).

> [T]he constitutional right to be present at one's own trial exists "at any stage of the criminal proceeding that is critical to its outcome if [the defendant's] presence would contribute to the fairness of the procedure."

United States v. Tureseo, 566 F.3d 77, 83 (2d Cir. 2009) ("Tureseo") (quoting Kentucky v. Stincer, 482 U.S. 730, 745 (1987)). "This right is codified in Rule 43 of the Federal Rules of Criminal Procedure which provides that a defendant, unless voluntarily absent, shall be present at every stage of the trial including . . . 'the return of the verdict.'" United States v. Rosario, 111 F.3d 293, 298 (2d Cir.) (quoting Fed. R. Crim. P. 43(a) (other internal quotation marks omitted)), cert. denied, 522 U.S. 969 (1997).

A defendant may waive his right to be present, either expressly, see, e.g., Diaz v. United States, 223 U.S. 442, 453, 455, 459 (1912), or by his conduct, see, e.g., Illinois v. Allen, 397 U.S. at 342-43. "[W]here the offense is not capital and the accused is not in custody, . . . if, after the trial has begun in his presence, he voluntarily absents himself, this does not nullify what has been done or prevent the completion of the trial, but, on the contrary, operates as a waiver of his right to be present, and leaves the court free to proceed with the trial in like manner and with like effect as if he were present." Diaz, 223 U.S. at 455. This exception to the defendant's right to be present is codified in Rule 43(c)--formerly Rule 43(b), see Crosby v. United States, 506 U.S. 255, 259-60 (1993)--which provides that "[a] defendant who was initially present at trial . . . waives the right to be present . . . when the defendant is voluntarily absent after the trial has begun," and that "[i]f the

19

defendant waives the right to be present, the trial may proceed to completion, including the verdict's return . . . during the defendant's absence," Fed. R. Crim. P. 43(c)(1)(A) and (c)(2). This rule, which "allows an ongoing trial to continue when a defendant disappears[,] deprives the defendant of the option of gambling on an acquittal knowing that he can terminate the trial if it seems that the verdict will go against him." Crosby, 506 U.S. at 262 (emphasis added).

"A defendant who deliberately fails to appear in court does so voluntarily," and "his absence can be considered a 'knowing' waiver." United States v. Tortora, 464 F.2d 1202, 1208 (2d Cir.) ("Tortora"), cert. denied, 409 U.S. 1063 (1972); see, e.g., United States v. Sanchez, 790 F.2d 245, 248-50 (2d Cir.) ("Sanchez"), cert. denied, 479 U.S. 989 (1986); United States v. Pastor, 557 F.2d 930, 933-34 (2d Cir. 1977) ("Pastor"). Waiver of a constitutional right, however, is not to be presumed; indeed, "[t]here is a presumption against" such a waiver. Brookhart v. Janis, 384 U.S. 1, 4 (1966); see, e.g., Glasser v. United States, 315 U.S. 60, 70 (1942). The district court "must vigorously safeguard a criminal defendant's right to be present." United States v. Fontanez, 878 F.2d 33, 36 (2d Cir. 1989) ("Fontanez").

"A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." Johnson v. Zerbst, 304 U.S. 458, 464 (1938); see, e.g., Tureseo, 566 F.3d at 83-84; Polizzi v. United States, 926 F.2d 1311, 1319 (2d Cir. 1991) ("Polizzi"); United States v. Hernandez, 873 F.2d 516, 518-19 (2d Cir. 1989) ("Hernandez"); Tortora, 464 F.2d at 1208. "The determination of whether there has been an intelligent waiver . . . must depend, in each case, upon the particular facts and circumstances surrounding that case . . . ." Johnson v. Zerbst, 304 U.S. at 464. When the issue is whether the defendant has waived his right to be present at a critical stage of the criminal proceedings by absenting himself, the district court ordinarily must conduct an inquiry on the record

to determine whether the defendant has a sound excuse for his absence, see Tureseo, 566 F.3d at 83-84, or whether instead the defendant's "absence . . . was, in fact, knowing and voluntary," Hernandez, 873 F.2d at 516. The defendant's absence on the date in question "must be appraised in the revealing light of what went on before and after that date." Pastor, 557 F.2d at 938; see also Sanchez, 790 F.2d at 251, 249 (stating that "[o]ur review of the district judge's exercise of discretion on this issue must be based on the relevant circumstances confronting the judge at the time of his ruling, without the benefit of hindsight," but noting that "no justification, either to the district court or on appeal, ha[d] been offered for [the defendant's] absence" (internal quotation marks omitted) (emphasis ours)).

The district court's ultimate decision whether to continue a trial while the defendant is voluntarily absent involves a balancing exercise that includes consideration of the public interest. See, e.g., Polizzi, 926 F.2d at 1319; Fontanez, 878 F.2d at 37; Pastor, 557 F.2d at 934.

> [T]here is an inherent public interest in preventing contumacious defendants from dictating the conduct of their trials, as Diaz makes clear. There is also an element of public interest in avoiding inconvenience to assembled jurors and witnesses and the delay of other cases on the court's docket caused by an uncertain adjournment of the trial. In weighing the public interest in proceeding with trial against the defendant's cherished and fundamental right to be present, the district court must give due regard to the circumstances of the waiver. While there are circumstances in which it would be impermissible for a court to proceed with trial, see, e.g., Fontanez, 878 F.2d at 37 (holding it impermissible to proceed in a single-defendant case where court was informed that defendant's absence because of police detention would likely be brief), there is usually sufficient justification to do so even in the defendant's absence if the court finds the defendant to have engaged in "stonewalling and other misconduct," Sanchez, 790 F.2d at 250, or if "there is no reasonable likelihood that the trial could soon proceed with the defendant present," id. at 251.

United States v. Nichols, 56 F.3d 403, 418 (2d Cir. 1995) (emphases added); see, e.g., Tortora, 464 F.2d at 1210 (public interest in proceeding with trial outweighed the defendant's right to be present

21

where, inter alia, "[e]xtensive delays would almost certainly have accompanied any adjournment and the Government's main witness would have continued to be in potential danger until his testimony was completed"); Fontanez, 878 F.2d at 37 (public interest in proceeding with trial did not outweigh the defendant's right to be present where court was informed--accurately--that the defendant was being officially detained and would be available shortly).

Our standard of review is multi-faceted. The district court's decision as to whether the defendant had a right to be present at the stage in question is reviewed de novo. See, e.g., Tureseo, 566 F.3d at 83; United States v. Canady, 126 F.3d 352, 360 (2d Cir. 1997), cert. denied, 522 U.S. 1134 (1998). "[T]he court's factual findings as to whether [the defendant] was knowingly and voluntarily absent will not be disturbed unless clearly erroneous." Polizzi, 926 F.2d at 1319 (internal quotation marks omitted); see, e.g., Sanchez, 790 F.2d at 249; Pastor, 557 F.2d at 934. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." United States v. Murphy, 703 F.3d 182, 188 (2d Cir. 2012). "[T]he Sixth Amendment . . . does not require the trial judge to accept at face value a defendant's claim of inability to appear in court," Pastor, 557 F.2d at 934; nor does it require this Court to "confine [itself] . . . to consideration only of the evidence tending to support [the defendant's] contentions," id. at 938. We defer to the district court's factual determinations in this context because we recognize that "the trial judge . . . is usually in a superior position to evaluate the evidence, including witnesses' credibility, because of familiarity with the background and circumstances." Id. at 934.

Once the district court has found that a defendant's absence at a particular stage of trial was voluntary, its decisions that the voluntary absence should be considered a waiver of the right to be present and that the circumstances warrant a continuation of the trial are reviewed for abuse of

discretion.  See, e.g., Tureseo, 566 F.3d at 83; Fontanez, 878 F.2d at 35-36.  If we determine that the court's decision to proceed with trial in the defendant's absence was an abuse of discretion, we nonetheless will consider "whether the error created any reasonable possibility of prejudice" or whether instead it was harmless.  Tureseo, 566 F.3d at 84 (internal quotation marks omitted); see, e.g., id. at 84-85 (holding that the failure to conduct an evidentiary hearing was harmless in light of the brevity of the defendant's absence during part of the jury charge, the instruction that the jury was not to draw any negative inference from the defendant's absence, and the overwhelming evidence of the defendant's guilt); Fontanez, 878 F.2d at 37-38 (holding that, in light of the government's report that the defendant would be arriving shortly, it was error, and not harmless, to address the jury's request for a read-back of testimony and to deliver an Allen charge in his absence); cf. United States v. Salim, 690 F.3d 115, 123-25 (2d Cir. 2012) (holding that it was error to find that the defendant's decision not to attend resentencing was voluntary without assessing the credibility and reasonableness of his explanation that that decision was based on his fear of abuse; but affirming because the issue was unpreserved and did not warrant reversal under plain-error analysis because the defendant did "not prove[] that his presence would have affected the outcome of his resentencing"), cert. denied, 133 S. Ct. 901 (2013).

B.  The Denials of a Continuance, a Mistrial, and a New Trial

With these substantive principles in mind, we turn to the district court's decisions to deny (a) Yannai's motions at trial for a longer continuance and a mistrial and (b) Yannai's postverdict motion pursuant to Rule 33 for a new trial.  A defendant's motion for a mistrial may be granted where something has occurred to interfere with the defendant's right to a fair trial.  See generally United

23

States v. Farhane, 634 F.3d 127, 168-70 (2d Cir.), cert. denied, 132 S. Ct. 833 (2011). A defendant's motion for a new trial pursuant to Rule 33 may be granted "if the interest of justice so requires." Fed. R. Crim. P. 33(a). The court's denial of either type of motion is reviewable for abuse of discretion, see, e.g., United States v. Marshall, 458 F.2d 446, 451 (2d Cir. 1972) (denial of a mistrial); United States v. Owen, 500 F.3d 83, 87 (2d Cir. 2007), cert. denied, 552 U.S. 1237 (2008) (denial of a new trial), as is the denial of a motion for a continuance, see, e.g., Bernstein v. Travia, 495 F.2d 1180, 1182 (2d Cir. 1974). A court abuses its discretion if (1) it relies on an erroneous view of the law, (2) its decision rests on a clearly erroneous finding of fact, or (3) its decision--though not necessarily the product of a legal error or a clearly erroneous factual finding--cannot be located within the range of permissible decisions. See, e.g., United States v. Owen, 500 F.3d at 87.

Preliminarily, we note that, although Yannai argues that the district court erred in opining that he had the burden of proving that his overdose was accidental rather than designed to commit suicide or to disrupt the trial, we need not decide the burden-of-proof question. Although seemingly conflicting statements as to which side has the burden can be found in our precedents, compare United States v. Salim, 690 F.3d at 119 ("the government has not satisfied its burden of proving that [the defendant] waived his right to be present"), with United States v. Sanchez, 790 F.2d at 249 ("the defendant bears the burden of justifying his absence from a known proceeding against him"), we think it clear (a) that in connection with the motion for a mistrial, the court did not impose the burden of proof on Yannai, and (b) that in connection with the motion for a new trial, the matter of which side bore the burden of proof as to whether the overdose was accidental or purposeful was immaterial.

24

When defense counsel moved for a mistrial, reporting on their conversation with Yannai after he regained consciousness, the district court found that Yannai's action was deliberate, without indicating in any way that Yannai had the burden of proof. Indeed, its decision as framed seems to indicate that the court viewed the burden of proof at that stage as being on the government-- and as having been easily met. The court stated that "the objective evidence strongly suggests . . . that this was a deliberate act" (Trial Tr. 1203), that "[b]ased on this record, in my mind it's quite clear that this was a deliberate act" (id. at 1204), and that deliberateness was established "certainly by more likely than not, and possibly beyond a reasonable doubt" (id. at 1203 (emphases added)).

In connection with Yannai's Rule 33 motion for a new trial, the court repeatedly expressed its view that the burden of proof as to whether Yannai's overdose was intentional or the result of an accident should be on Yannai, as that information was peculiarly within his knowledge. (See, e.g., April 2013 Tr. 22-23; Tox. Tr. 83-85; Sent'g Tr. 2-8.) However, there was no dispute that the standard of proof on that issue was preponderance of the evidence, i.e., which circumstance was more likely than not; and, as the district court recognized, allocation of the burden of proof under that standard is material only if the evidence is evenly balanced (see, e.g., Sent'g Tr. 17 ("the party who bears the burden of proof where the evidence is [in] equipoise loses")). But the record is clear that the court did not find the evidence as to whether Yannai's overdose was deliberate evenly balanced:

> MS. HINDE [Yannai's attorney]: . . . . [I]s it the Court's finding that the evidence is in equipoise?
>
> . . . .
>
> THE COURT: He took it deliberately--you know, I don't find it in equipoise. I find that it's more likely than not that he took it deliberately.
>
> MS. HINDE: All right. Okay. So no equipoise.

25

(Id. at 18-19 (emphases added).) In finally denying Yannai's motion for a new trial "in the interest of justice" (id. at 28-29), the court said that "even if the government had the burden of proof, I would still find that his absence was voluntary and deliberate" (id. at 29).

In sum, the district court did not deny Yannai's motions on the basis of any view that the evidence was evenly balanced. Accordingly, we need not further address the matter of allocation of the burden of proof. To the extent that the burden was on the government, it was found to have been satisfied.

## 1. The Denials of a Longer Continuance and a Mistrial

We see no error of law in the district court's refusal to adjourn the trial for more than one day or in its denial of Yannai's motion for a mistrial. After being informed that Yannai was not present and was in the hospital, the court sought to determine the cause of his hospitalization. The court noted that a defendant has the right to be present at trial, including the stages at which the instructions are being given to the jury and the jury is deliberating. It also correctly noted that the court may proceed with a trial from which the defendant has voluntarily absented himself, but that if Yannai "ha[d] a legitimate medical excuse," that would not constitute a voluntary absence. (Trial Tr. 1167.)

Nor can we see any abuse of discretion in the court's efforts, described in Part I.C. above, to determine the reason for Yannai's absence, or any clear error in its subsequent findings. After being informed that Yannai had been hospitalized and was unconscious for reasons as yet unknown, the court promptly adjourned the trial for the day, without deciding when the trial would be resumed (see, e.g., Trial Tr. 1172-74). The court was then informed that a hospital psychiatrist told

26

federal agents that "'[i]t appeared that Mr. Yannai had tried to commit suicide by taking an overdose'" (id. at 1177), and that the psychiatrist sought information from the agents because Yannai's medical records revealed his August 2010 overdose but Yannai's wife denied that he had previously overdosed (see id. at 1177-78). Defense counsel, after speaking with the psychiatrist, confirmed to the court that the medical assessment was "that it was an overdose" (id. at 1182; see id. at 1185).

The court then by telephone, with counsel present, proceeded to solicit information directly from both the psychiatrist and the internist who was primarily responsible for attending to Yannai. Both doctors confirmed that the consensus of all of the physicians involved in his care was that "the most likely explanation for his being unconscious . . . was . . . an overdose of Valium or some such medication." (Id. at 1187; see id. at 1188 ("this is likely an overdose case").) Although defense counsel argued that the medical opinions were inconclusive as to whether Yannai had attempted suicide, they acknowledged that "[i]t appears to be an ove[r]dose." (Id. at 1191.)

Yannai's reliance on the First Circuit's decision in United States v. Latham, 874 F.2d 852 (1st Cir. 1989), for the proposition that "ingesting a potentially lethal overdose . . . 'does not mean that [the defendant] voluntarily absented himself from trial'" (Yannai brief on appeal at 44 (quoting 874 F.2d at 858)), is unpersuasive. Although that court stated that "[i]t defie[d] common sense to maintain that a sane defendant would attempt suicide to avoid a trial on drug charges," 874 F.2d at 858, what common sense suggests depends on the circumstances; and there is no hint in that opinion that the defendant had ever previously attempted suicide--unlike Yannai's acknowledgement that in August 2010 he attempted suicide "because [he] didn't want to go to jail" (Bail Tr. 42).

The district court's finding that Yannai's overdose was "the result of a voluntary act" (Trial Tr. 1191) was supported by the toxicology report of drugs in Yannai's urine; by the physicians'

consensus, after ruling out other causes, that Yannai had overdosed to such an extent that he might not regain consciousness for two more days; and by Yannai's admission at his bail hearing that he had already once attempted to commit suicide by means of an overdose in order to avoid going to jail (see Bail Tr. 35, 42; see also Trial Tr. 1191 ("He's done it once before.")). We cannot conclude that it was clearly erroneous for the court to find that Yannai's overdose preventing his presence at trial on June 1 was deliberate.

In considering whether the trial should be resumed despite Yannai's absence, the district court weighed Yannai's "right to be here if he wanted to be here[, a]nd if he didn't voluntarily absent himself" (Trial Tr. 1192) against the fact that the proceedings had been completed through the presentation of evidence, the closing arguments, and the finalization of the instructions to be given to the jury, and against the court's assessment that for the final stages of the court's delivery of the instructions and the jury's deliberations, Yannai would have nothing to contribute. Given these considerations and the medical estimate that Yannai could be unconscious for at least two more days, the court decided that the trial should be resumed at noon on June 2. Although it would have been within the court's discretion to grant a longer continuance in hopes of obtaining information from Yannai himself after he regained consciousness, it was not an abuse of discretion to decline to do so. At least one day of jury time had been wasted (see id. at 1174 ("I've dragged" these "twelve citizens . . . . in here today. I'm going to send them home after--in less than an hour.")), and on June 2, the second day of Yannai's absence, it was reported that the earliest he was likely to be released from the hospital was late Friday night or Saturday (see id. at 1204). And if there was any error in not granting the two- or three-day continuance advocated by defense counsel, it was harmless, for such a continuance would not have sufficed to permit Yannai to attend the remainder of trial: He was not

28

released from the hospital until June 10. Yannai has not identified any aspect of the public interest that foreclosed resumption of the trial in his absence.

Nor can we conclude that the district court abused its discretion in denying the defense motion for a mistrial. In that motion, made on June 3 shortly after the jury informed the court that it had reached a verdict, but before the verdict was read, defense counsel stated that they had just spoken to Yannai by telephone, that Yannai "told us that he did not intentionally overdose on any medications" (Trial Tr. 1345), and that Yannai said "he had taken Valium the night before but he woke up in the morning" and set out for court (id. at 1346 (emphasis added)). Counsel argued that Yannai therefore should not be found to have absented himself voluntarily. The district court declined--appropriately--to grant a mistrial "on the basis of [Yannai's] unsworn statement" (id. at 1347). And the court found Yannai's statement to be "implausible" (id.) in light of, inter alia, Yannai's "prior [suicide] attempt" (id.) and the unlikelihood that one would "sleep for two days" from "tak[ing] one or two Valiums before . . . go[ing to bed]" (id. at 1348).

The court's skepticism proved to be well warranted, for Yannai's eventual sworn declaration and the subsequently obtained hospital records showed that the statement relayed to support the mistrial motion was misleadingly incomplete. Yannai's representation at the time of the mistrial motion not only failed to state that he took more than the prescribed one-tablet dose of Valium before going to bed the night before his June 1, 2011 failure to appear in court, but also omitted that he took perhaps an additional dozen or more Valiums during the night. In his February 2012 declaration, Yannai revealed that he had taken "two or three Valium tablets before . . . bed," plus "another two or three tablets" "[w]henever [he] woke during the night and could not get back to sleep--which occurred several times." (Yannai Decl. ¶¶ 9, 6.) Assuming that "several" means just three or

four, Yannai had ingested at least eight (two pills before bed plus two on three occasions during the night) and as many as 15 (three pills before bed plus three on four occasions during the night) Valiums that night. In addition, Yannai told the hospital psychiatrist that he had taken another "bunch" of Valiums at about 5 a.m. on June 1, another fact not revealed at the time of the mistrial motion.

In sum, we cannot conclude that the district court's decision on June 1 to proceed with the trial in Yannai's absence or its denial of the June 3 motion for a mistrial constituted an abuse of discretion.

### 2. The Denial of Yannai's Motion for a New Trial

Nor do we see an abuse of discretion in the district court's conclusion that the interest of justice did not warrant a new trial. In connection with Yannai's Rule 33 motion, the court received the opinions of the parties' experts as to whether Yannai had overdosed and if so whether the overdose was accidental or intentional; and the court appointed Dr. Milman as a neutral expert to address those questions.

As described in Parts I.C. and D. above, the general medical consensus was that there had been an overdose. Yannai's claim in his declaration that he "never took excessive amounts" of Valium was ludicrous in light of his admission in that declaration that he took "two or three tablets at a time . . . several times a night" (Yannai Decl. ¶ 6). Dr. Milman indeed doubted whether the pills ingested by Yannai in 2011 were Valium, theorizing that they were probably temazepam pills, which were six times stronger than the Valium pills Yannai had been prescribed (and which had last been prescribed in 2007). Given that Yannai was rendered unconscious "for about two and a half days and

30

[was] in a near coma state" (Tox. Tr. 57-58), Dr. Milman estimated that Yannai must have ingested at least four and perhaps as many as 10 temazepam pills (see id. at 72)--i.e., as much as 300 mg of benzodiazepine, and toxicologist Spratt estimated that Yannai must have ingested at least 380 mg of benzodiazepine (see Spratt Decl. ¶ 5 (Valium, according to Yannai)). Spratt opined that the overdose was "purposeful[]" (id.); Dr. Milman, as described in Part I.D. above, opined variously that the overdose may have been "accidental" (Tox. Tr. 72), or was "intentional" (id. at 14) or "deliberate" (id. at 32). Dr. Stripp's view was that neither "the science of toxicology [n]or its practitioners possess tools to determine whether an overdose was the result of accidental or intentional behavior." (Stripp Decl. ¶ 14.)

In light of the record, there was no genuine doubt that Yannai's failure to appear in court on June 1 was the result of an overdose:

> THE COURT: .... Is it your position that it wasn't an overdose at all?
>
> ....
>
> MR. CHECKMAN [counsel for Yannai]: My position--we don't challenge the fact that there may very well have been an overdose of Benzodiazepine in--what we contest is whether that overdose was anything other than accident.

(Tox. Tr. 10-11.)

As to what "other than accident" may have precipitated the overdose, the district court noted that the appropriate inquiry was not, narrowly, whether Yannai had attempted suicide; it was whether his absence from trial on June 1 was voluntary, and, if so, whether the purpose of his absence was disruption of the trial proceedings. (See, e.g., id. at 14.) The court's findings that Yannai's overdose was intentional, and that his absence was voluntary and designed to disrupt the trial, were supported by the record. Yannai's overdose in August 2010 had resulted in his being hospitalized for

31

two days. (See, e.g., Bail Tr. 43 ("I was unconscious for two days.").) The court permissibly inferred that, having had that experience, Yannai would have been aware that a new overdose during the trial would similarly result in his being unconscious and unable to attend court for a period of days. The court was entitled to be skeptical of Yannai's claim of optimism as to the likely outcome of the trial, especially given the court's own assessment that the evidence against Yannai was overwhelming. It was also entitled to find not credible the claim that Yannai intended to be in court on June 1, given that to do so he needed to leave home at 7 a.m. but took "a bunch" of additional Valiums to go back to sleep at 5 a.m. Yannai's first intentional overdose was admittedly motivated by his desire not to go to jail. It was not clearly erroneous for the court to find that his second intentional overdose, taken after hearing all the evidence against him and predictably making him unavailable for the final days of his trial, was designed to forestall the likely verdicts against him.

In light of these findings, the court concluded that the interest of justice did not warrant a new trial, which would have necessitated, inter alia, convening a new jury and putting the women who testified that Yannai had fraudulently hired and then sexually abused them--and who were residents of five different foreign countries--through the inconvenience and trauma of testifying again. We cannot conclude that the denial of a new trial was an abuse of discretion.

C. The Claim of Prejudicial Publicity

Yannai also contends that he was unduly prejudiced by media reports during trial, heard by some of the jurors, that he had attempted to commit suicide. We see no flaw in the district court's handling of this matter. After consulting with counsel, the court questioned the three jurors who had heard of the media reports; all three said their ability to continue as fair and impartial jurors

32

would not be affected by what they had heard. See generally United States v. Scopo, 861 F.2d 339, 349 (2d Cir. 1988), cert. denied, 490 U.S. 1048 (1989); United States v. Gaggi, 811 F.2d 47, 51 (2d Cir.), cert. denied, 482 U.S. 929 (1987); United States v. Gigante, 729 F.2d 78, 82 (2d Cir.), cert. denied, 467 U.S. 1206 (1984). Defense counsel made no objections and did not suggest that anything further need be done. We see no abuse of discretion in the court's determination that the jurors retained the requisite impartiality and that the publicity did not warrant a new trial.

Yannai argues, however, that he was prejudiced by the district court's refusal to grant more than a one-day continuance of trial because a two-day continuance would have allowed the jury to be told that the reports of attempted suicide "were not true." (Yannai reply brief on appeal at 21; see also Declaration of Michael Schneider dated September 7, 2012, ¶ 11 (after Yannai regained consciousness and said he had not attempted suicide, the jury could have been told that the media reports "w[ere] simply not true").) This contention is meritless, as it assumes the truth of Yannai's representation that he did not again attempt suicide, which was far from established.

CONCLUSION

We have considered all of Yannai's arguments on this appeal and have found them to be without merit. The matter is remanded for clerical correction of the judgment to show that Yannai's conviction on Count 7, unlawful employment of aliens, was under 8 U.S.C. § 1324a, rather than 8 U.S.C. § 1324. The judgment is otherwise affirmed.